**UNITED STATES of America ex rel. Tyrone B. LARKINS, Appellee,**

v.

**Russell G. OSWALD, Commissioner of Corrections of New York State, et al., Appellants.**

No. 313, Docket 74–1885.

United States Court of Appeals, Second Circuit.

Argued Oct. 24, 1974.

Decided Jan. 24, 1975.

584

Margery Evans Reifler, Deputy Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of N. Y., Samuel A. Hirshowitz, First Asst. Atty. Gen., of counsel), for appellants.

E. Thomas Boyle (William J. Gallagher, The Legal Aid Society, Federal Defender Services Unit, New York City, of counsel), for appellee.

Before WATERMAN, OAKES and GURFEIN, Circuit Judges.

OAKES, Circuit Judge:

This case is a nice example of the wisdom of Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), holding that in prison disciplinary proceedings minimal due process requires advance written notice of the charges to the inmate no less than 24 hours before his appearance before the adjustment committee, together with a written statement by the factfinders as to the evidence relied upon and the reasons for the disciplinary action.[1] It comes to us by way of appeal from the United States District Court for the Western District of New York, John T. Curtin, *Judge,* following a $1,000 award by a jury for damages in a civil rights action by an inmate arising out of his solitary confinement for 12 days at Attica Prison (more properly known as Attica Correctional Facility) for possession of "revolutionary" papers in his cell. Liability was determined by the court, upon cross motions for summary judgment, in the light of Sostre v. McGinnis, 442 F.2d 178, 202–203 (2d Cir. 1971) (en banc), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740; 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972), which holds, *inter alia,* that a prisoner cannot be punished for possessing political papers. All of the defendant-appellants claim that there were material issues of fact in dispute so that summary judgment should not have been granted and that the jury award of $1,000 damages was grossly excessive. Commissioner Oswald and Warden Montanye each claim that they were not personally liable. We affirm the judgment.

The rule of law is, of course, that summary judgment can be granted only if there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c); Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); Doehler Metal Furniture Co. v. United States, 149 F.2d 130, 135 (2d Cir. 1945). At the same time summary judgment as a useful procedural tool is not to be discarded on the the flimsiest of ex-

---

1. *See also* Oakes, J., dissenting in Nieves v. Oswald (II), 498 F.2d 802, 806, 812–813 and n. 17 (2d Cir. 1974).

cuses; the issues of fact must be genuine, not sham. *See* Dressler v. MV Sandpiper, 331 F.2d 130, 132, 133 (2d Cir. 1964); 6 J. Moore, Federal Practice ¶ 56.15[1.-02] (Supp.1973) at 53 (2d ed. 1948).

Here it appears from the pleadings and the documentary material submitted by the appellants themselves that appellee, Larkins, a life inmate of Attica Correctional Facility, was on or about June 7, 1972, confined in isolation, Housing Block "Z" (HBZ), on a misbehavior report for having inflammatory and revolutionary papers in his possession on June 6, 1972. He was ordered to be confined for seven days by the "Attica Adjustment Committee," the prison disciplinary committee, of which appellants Clor and Elmore were members. Appellee was actually confined for 12 days and no explanation has been given for the additional confinement.

The "Inmate Misbehavior Report to Superintendent" Montanye, which was signed by Correction Officer Amico and endorsed by Correction Officer Tiede, explains that at 3:00 p. m., June 6, 1972, "upon observing this man in the yard with a group of inmates Officer Tiede and myself frisked this man's cell and found Black Pantor [sic] Party papers and revolutionary papers in his cell (copies are attached)." The Inmate Misbehavior Report went on to mention "Larry Tinsley 27825 10/27 in with group of known Black Panthers, cell was frisked, contraband found." [2]

The "Adjustment Committee Report" on Larkins signed by its chairman, Lt. Clor, says, under the heading "Inmate's Explanation and Attitude," "Inmate appears belligerent and uncooperative toward institutional policies—believes in revolution—inmate admits affiliaties to Black Panter Party [sic]." There is no space provided on the Adjustment Committee Report for entering the charges or findings other than "Disposition . . (specify) Confinement in HBZ for 7 days with loss of yard and recreation."

The "Indeterminate — Punishment Record" indicates that on 6/6/72 Larkins' punishment was "K.L. in HBZ 7 days w/no yd or rec" and his offense was that he "[h]ad in his poss. revolutionary papers, Black Panther Party Papers." The undisputed facts further indicate that the two papers found in Larkins' cell consisted of an undelivered handwritten letter to "Bro. Bob" reprinted in the footnote [3] in its entirety and a somewhat lengthier handwritten document in two parts, the first entitled "Central—Revolutionary Format" and the second "Black Panther Party Ten Point Program—Platform." The "Central—Revolutionary Format" describes a "gurrilla's [sic]" organization including a "heavy weapons crew" and "rescue and recovery unit" and states that "this committee's primary objective at this point is revolutionary-political education"; it sets forth the "revolutionary-educational curriculum" including political, social, cultural and economic indoctrination and "military-industrial complex," all of

---

**2.** It appears that in Tinsley's cell was found the following description: "A plastic explosive compound used for military use. Comprised of Nitrathylamine (a volatile form of nitroglycerine). Potassium and chip form of Plastic Cordite with a *form ?* of synthetic Magnesium." The Adjustment Committee report on Tinsley read "Inmate appears cooperative and respectful toward this committee" under the heading "Inmate's Explanation and Attitude." The disposition of Tinsley's proceeding was "counseled & released."

**3.** Bro. Bob:

Dickie and *Valentine* will be the one's that will inform the Party & masses of my whereabout and activity.

Get in touch with Dickie in the yard—the brothers & comrades know about. But you must come around—the Brothers are waying for you. Take care yourself and keep on pushin!

Prisoner Power/over
Tyrany Power
"All Power to the People"
¡Palante Hasta La Victoria!
Venceremos.
Ho Chi Minh—P.R.N.L.F.
(Younglords Party)
G.I.
Jose Enrique Paris

which are said to constitute a "tactical intelligence combat unit." The Black Panther Party Ten Point Program or Platform states some constructive, some not so constructive (or, indeed, destructive) objectives for black people to espouse. If all to be considered is the foregoing there is no genuine issue of fact.

The appellants contend, however, that certain facts alleged in supplementary affidavits filed by Lt. Clor and Correction Officers Amico and Tiede must be taken into account and that these affidavits show

> that plaintiff was also charged with advocating the disruption of the institution to the inmates he had met in the yard; that the content of the material taken from his cell (especially the letter) indicated that it was meant to be disseminated to others; and that plaintiff's attitude toward institutional policies was belligerent and uncooperative.

Appellants' Brief at 7.

There is no doubt that the supplementary affidavits do to some extent support the three propositions advanced by appellants. Correction Officer Amico's affidavit avers that he "was familiar with Larkin's [sic] past at the institution" and "knew that he was an active leader in instigating dissent . . . constantly defied institutional rules and policies . . . encouraged other inmates to be defiant . . . and . . . was pursuing a persistent course of disturbing the tranquility of the institution." Officer Amico also said that with the memory of the Attica riot "vivid" in his mind he was fearful that the meeting among six inmates at which Larkins was speaking (prior to the search of his cell)

"was a sign that some problems was [sic] in the stage of development." Officer Amico's affidavit, however, states nothing as to the *charges* or the *findings* except that "[i]n the disciplinary proceeding for Larkins', he readily admitted that he was affiliated with the Black Panter [sic] and that he believed in Revolution."

Correction Officer Tiede stated that he came upon six inmates in A yard with Larkins standing and five inmates sitting around a table, and that "[a]s I approached, the inmate [Larkins] stopped speaking." He added that "realizing that it was unusual for six (6) inmates to be gathered in a group and one (1) of them appearing to be lecturing the other five (5) as if in a study group," he joined Officer Amico and proceeded to the cells of Larkins and Tinsley. In Larkins' cell "[w]e found certain inflamatory [sic] documents. . . ." He also says nothing about the *charges* or *findings*.

Lt. Clor's affidavit is the only one which refers to the charges, in language set forth in the footnote,[4] but *makes no reference to any findings* of the Adjustment Committee (which consisted of appellant Elmore and Correction Officer Brimmer in addition to Clor himself), except to say that the Committee's "discretion" was exercised "with the full realization of Larkins' procedural due process rights" and that "everyone concerned acted within the scope of their lawful authority. . . ."

Thus, if Wolff v. McDonnell, *supra,* were to be applied retroactively there would be no question whatsoever that summary judgment would be proper since nothing indicates that there was any written notice of the charges to Larkins or that there were any findings by

---

4. The Committee stated the charges to Larkins, namely, that he had conducted a meeting in "A" Yard during which he improperly lectured to the other five (5) inmates in the group, wherein, he advocated the disruption and overthrow of the institution. The Committee further charged him with the possession of inflamatory [sic] written materials.

Larkins admitted that he was affiliated with the Black Panther Party and that he believed

in Revolution and that forceful overthrow of existing authority was the only way to achieve certain ends.

Larkins never denied that he had lectured to the group of the other five (5) inmates on the advocacy of the overthrow of the institution.

the Adjustment Committee or reasons stated in connection therewith. While Wolff v. McDonnell is not to be applied retroactively, 418 U.S. at 573, 94 S.Ct. 2963, our own Sostre v. McGinnis, *supra,* indicates that some elements of due process, including being "confronted with the accusation" and "informed of the evidence against him," were applicable to the prison disciplinary proceedings that here took place. 442 F.2d at 196–199, especially at 198. We need not determine, however, whether due process under *Sostre* required either written findings by the Adjustment Committee as to what Larkins was being punished for or some written statement of charges.[5] Nor do we need to determine the question of liability solely on the basis that Larkins was actually confined in segregation for 12 days when in fact his disciplinary proceedings called for confinement only for seven. The variety of possible charges, the erroneously long confinement are all part and parcel of an internal disciplinary system which doubtlessly contributed to the Attica riot in the first instance (*see* Attica: The Official Report of the New York State Special Commission on Attica (Bantam ed. 1972) 74–79), which have resulted in other litigation,[6] but which in any event are now outmoded and, for the future at least, wholly unconstitutional under Wolff v. McDonnell, *supra.*

Rather, we think that to the extent the supplementary affidavits are inconsistent and in conflict with the written documentation and the admissions in pleadings, they must, as Judge Curtin held, be disregarded. The only documented reason for Larkins' confinement appears in the Punishment Record. This mentions only possession of the described papers. Regardless whether other charges were made, there is no evidence

that any other charges were supported by evidence. The prison officials cannot now retry Larkins, after his punishment, to justify that punishment which, as it appears on the prison records, was imposed for impermissible reasons under Sostre v. McGinnis, *supra.*

As Judge Curtin pointed out, moreover, there is a discrepancy between the written Adjustment Committee Report and Lt. Clor's affidavit. Lt. Clor's affidavit claims that Larkins was charged with advocating to the five inmates the overthrow of the institution but does not claim that such a charge was sustained. The Adjustment Committee Report does not indicate that anything was said in the Committee about Larkins' remarks directed to the inmates in the yard. C. O. Tiede specifically said that Larkins *stopped* speaking when he approached. Thus, Lt. Clor's affidavit as to the charge with the statement that "Larkins never denied that he had lectured to the group of the other five inmates on the advocacy of the overthrow of the institution" is irrelevant since none of the officers heard what Larkins said to the group.

As for the "Bro. Bob" letter, neither the Inmate Misbehavior Report nor any documents or affidavits submitted allege that Larkins intended to deliver this letter. Indeed, the Assistant Attorney General offered to return the confiscated materials, which must mean either that Larkins did not intend to circulate them or that in the Assistant Attorney General's view they did not constitute a threat to the proper functioning of the institution. While the other papers, the "Central—Revolutionary Format" and "Black Panther Party Platform" contain considerable revolutionary or militant rhetoric, they admittedly have to be con-

---

5. The charges here, from the admissions and the pleadings, the supporting affidavits and the documentary evidence, could have included past misbehavior, lecturing a group of other inmates on the advocacy of overthrow of the institution, affiliation with the Black Panther Party, belief in revolution, possession of inflammatory materials, a charge (as appel-

lants' brief states) that the letter and the other materials were "Meant to be disseminated to others," or that Larkins had a "belligerent and uncooperative attitude" toward institutional policies.

6. Inmates of Attica Correctional Facility v. Rockefeller, 453 F.2d 12 (2d Cir. 1971) (preliminary injunction against reprisals).

sidered as in the nature of political materials.

■■■ As in *Sostre,* then, Larkins was punished "simply for putting his thoughts on paper, with no prior warning and no hint that he intended to spirit the writings outside his cell." 442 F.2d at 202. It is clear that under *Sostre,* 442 F.2d at 202–203, possession of these documents in the cell cannot be made the subject of disciplinary proceedings. Indeed, appellants do not argue otherwise, nor apparently have they at any time.[7] The only denial of the allegation in the amended complaint that Larkins was placed in isolation "for having inflammatory . . . papers in his possession" was a denial that the papers "were not being distributed or published." That denial was flatly contradicted by the prison documents and affidavits later submitted and therefore must be ignored. Weyerhaeuser Co. v. Gershman, 324 F.2d 163 (2d Cir. 1963). *See also* Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944). Even Lt. Clor's affidavit does not dispute that appellant was charged with possession of the revolutionary papers; it only says that he was "also charged" with advocating disruption of the institution. Even then Clor's affidavit does not allege that that charge was sustained or that it served as the basis for Larkins' confinement to segregation. As we have said, the overwhelming documentary evidence establishes that that additional charge was not sustained and

did not serve as the basis for punishment, nor could properly do so since there was no evidence to support it. That he was "also charged" with advocating disruption is therefore irrelevant here.

If it is also appellants' claim, as it seems to be (Brief at 7), that Larkins was confined to segregation for his "uncooperative" attitude toward the institution, we can only say that this would establish a violation of first and probably fifth amendment rights that would be more serious than the violation actually complained of. Even the correctional services regulations then in effect required a violation of "a rule or regulation" or "[refusal] to comply with an instruction" or "[engaging] in some other unlawful conduct." 7 N.Y.C.R.R. § 250.-1;[8] United States ex rel. Haymes v. Montanye, 505 F.2d 977, 980 (2d Cir. 1974).

■■■ Appellants Oswald and Montanye argue that there was an issue of fact as to whether they knew or should have known of the unlawful confinement and nonetheless failed to act to release Larkins. The answer they filed neither denied nor admitted allegations as to their liability "for the reason that the defendants at all times acted lawfully and within the scope of their authority." The record indicates that these two appellants did not deny in their answer that they knew or should have known of the confinement; they filed no affidavits

7. In this respect we note that after Larkins had filed his original pro se complaint and before counsel was appointed for him, an Assistant Attorney General filed an affidavit in opposition. This affidavit indicated that a reading of the material found in the cell "would appear to indicate that clandestine activity might be taking place within the prison walls," and that after discussion with the Deputy Superintendent, despite the "Bro. Bob" letter, counsel had indicated that "it would be preferable not to get into materials and writings which can be characterized as political materials," counsel reommending that the punishment record of confinement be expunged so that the incident would not have any unfavorable effect upon Larkins' prison record.

A supplementary affidavit filed after Judge Curtin appointed counsel for Larkins relied heavily upon the "Bro. Bob" letter and its closing "Prisoner Power/Over Tyrany [sic] Power." Attached to the first of these affidavits, however, had been a letter from the Deputy Superintendent to the Assistant Attorney General stating that Larkins was "locked up on a misbehavior report for having inflammatory and revolutionary papers in his possession on June 6, 1972."

8. Concededly, however, 7 N.Y.C.R.R. § 252.5 permits disciplinary action for almost any attitude, let alone conduct. Presumably it is being revised, at least in the light of Wolff v. McDonnell, *supra,* if not of *Sostre.*

asserting this. More important, they were afforded, as Judge Curtin observed, on "a number of occasions . . . before the trial, during the trial and after the trial was concluded and before judgment was entered" opportunity to assert separate defenses but did not do so. Again and again the judge asked whether there was any objection to the plaintiff's proceeding against *all* the defendants, and he was again and again given assurances that "as far as judgment was concerned here it could be entered against all defendants. . . ." As Judge Curtin pointed out, if at any stage the appellants Montanye and Oswald had asserted the defenses they now seek to make, Larkins "would have been on notice" and then could have brought in additional evidence to show the relationship between these appellants and the correctional officers. Basista v. Weir, 340 F.2d 74, 85 (3d Cir. 1965); Fed.R. Civ.P. 16(3). The correctional services regulations, 7 N.Y.C.R.R. § 251.4(a), moreover, require that "every incident of misbehavior involving danger to life, health, security or property must be reported to the superintendent as soon as practicable." [9] That procedure was followed here because one of the documents submitted by the appellants, "Inmate Misbehavior Report to Superintendent," along with the "Superintendent's Action on Review of Adjustment Committee Report," established that appellant Montanye confirmed the Adjustment Committee's illegal action. He cannot avoid the responsibility on the basis of his deputy's review because correctional service regulation 7 N.Y.C.R.R. § 250.4(a) provides that "instructions given by an employee designated [by the superintendent] to furnish same shall be deemed to be instructions given by the superintendent." Commissioner Oswald is in the same position. *See* 7 N.Y.C.R.R. § 250.-4(b). New York Correction Law § 137(6)(d) effective during the time in

question required each facility's superintendent to make a "full report" to the Commissioner, at least every five days, of all inmates held in segregation. (With the amendments of 1974 the statute requires such a report only once a week.) *See* Wright v. McMann, 460 F.2d 126, 131 (2d Cir.), cert. denied, 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972). Oswald, therefore, is chargeable with knowledge of appellee's confinement, especially since in view of his confinement for 12 days there should have been a report to Oswald on at least two separate occasions.

The jury verdict is not "so grossly excessive as to shock the judicial conscience." Caskey v. Village of Wayland, 375 F.2d 1004, 1007 (2d Cir. 1967). There is no claim that the appellants were not furnished a fair trial by court before the jury. Appellants themselves had requested jury trial. Particularly in a civil rights case the amount of damages is a question for the jury's determination. Basista v. Weir, 340 F.2d at 88, *quoting from* Wayne v. Venable, 260 F. 64, 66 (8th Cir. 1919). Even though appellee had two or three showers, one attorney visit and two visits to the prison hospital, he was locked in his cell 24 hours a day for a period of 12 days. Ordinarily he would have at least 4½ hours in the prison yard and meals with other inmates. He was forced to submit to the humiliating "strip search" which included a probe of his rectum by prison guards. He was marched naked to the segregation cell where he waited an hour before being given clothing. Under the Department of Correctional Services regulations for segregation, 7 N.Y.C.R.R. § 301.5, he was entitled, unless there was "imminent danger that an inmate will do injury to himself or to another," to a minimum of one hour of exercise out of doors, weather permitting, each day, after the fifth day of confinement, or to

---

9. This was not a "minor infraction" since Larkins was not merely counseled. 7 N.Y.C.R.R. § 251.5(a) provides:

An employee should deal with minor infractions, or other violations of rules and policies governing inmate behavior, that do not involve danger to life, health, security or property by counseling, warning, and/or reprimanding the inmate, and the employee need not report such minor incidents.

one hour of exercise in the exercise room, but he was given neither. Finally, the fact that he was kept five days longer than the Adjustment Committee had directed and five days longer than permitted under prison regulations, 7 N.Y.C. R.R. § 252.5(e)(3), undoubtedly must have created an anguish and anxiety or fear of indefinite confinement to segregation, matters for which he was entitled to be justly compensated. Probably it would be difficult for anyone, juror, lawyer or judge, properly to assess the psychological impact of solitary confinement for 12 days, five of which are spent without knowing when the confinement is going to end. *Cf.* Rhem v. Malcolm, 371 F.Supp. 594, 601–607 (S.D.N.Y.1974), aff'd in part and rev'd in part, 507 F.2d 333, 338 (2d Cir. 1974).

Judgment affirmed.