**Kathie E. RAUCCI, Individually and as Administratrix of the Estate of Chad Joseph Raucci, Deceased, Plaintiff–Appellee,**

v.

**TOWN OF ROTTERDAM, Alfred DeCarlo, David Bethmann, Wayne Calder and Robert DeCarlo, Defendants–Appellants.**

No. 526, Docket 89–7693.

United States Court of Appeals, Second Circuit.

Argued Dec. 14, 1989.

Decided April 27, 1990.

# 1052

Arthur F. McGinn, Jr. (Thomas Drislane, McGinn Law Firm, P.C., Albany, N.Y., of counsel), for plaintiff-appellee.

Gregory S. Mills (Terence P. O'Connor, Carter, Conboy, Bardwell, Case, Blackmore & Napierski, Albany, N.Y., of counsel), for defendants-appellants.

Before VAN GRAAFEILAND, PIERCE, and MINER, Circuit Judges.

MINER, Circuit Judge:

Defendants-appellants, the Town of Rotterdam, New York, Rotterdam Police Department Deputy Chief Alfred DeCarlo, and Officers David Bethmann, Wayne Calder, and Robert DeCarlo (collectively "defendants"), appeal from a judgment entered in the United States District Court for the Northern District of New York (Gagliardi, J.) after a jury trial, in favor of plaintiff-appellee Kathie Raucci ("Ms. Raucci") for her injuries and for the wrongful death of her son Chad.[1] Defendants contend that the pendent state law claims should not have been considered after dismissal of the federal claims, that the Town of Rotterdam (hereafter "Rotterdam") owed no "special duty" to plaintiff by reason of any "special relationship," and that the award of damages for Chad's wrongful death was excessive. For the reasons that follow, we affirm, except as to the wrongful death

award which is remanded for disposition as hereinafter provided.

## BACKGROUND

This action arises out of a shooting incident on June 30, 1985, in Schenectady, in which Joseph Raucci (hereafter "Mr. Raucci") injured Ms. Raucci, his estranged wife, and killed their six-year-old son Chad.

On March 12, 1985, the Rauccis entered into a separation agreement which granted custody of the couple's two children, Pamela and Chad, to Ms. Raucci. On May 13, Ms. Raucci appeared with Chad at the Rotterdam Police Department station and reported that Mr. Raucci earlier that evening had punched her and threatened to kill her. She pointed to a neck injury that resulted from the assault and sought the arrest of Mr. Raucci. She told the officer on duty, Sergeant David Bethmann, that she was legally separated from her husband. Bethmann suggested that she could either have Mr. Raucci arrested or get an order of protection. The next day, the Rauccis filed separate criminal complaints, charging each other with assault in the third degree. See N.Y. Penal Law § 120.00(1), (2) (McKinney 1987). Both complaints were withdrawn after Ms. Raucci obtained a temporary order of protection from the Schenectady County Family Court. The order was converted into a permanent mutual order of protection on May 20. Shortly thereafter, Ms. Raucci notified the Rotterdam Police Department that she had the permanent order of protection and that her husband was persisting in his threats to kill her. She gave the police her address in anticipation of future problems.

Ms. Raucci returned to the Rotterdam Police on June 1 to report that Mr. Raucci had attempted to run her car off the road while she was driving with Chad earlier that day. She also reported that Mr. Raucci had been demanding that she let him have Chad. She requested, and received, a police patrol at her home that night. On June 10, she telephoned the police and told

---

1. Although the notice of appeal names all the defendants as appellants, the action was discontinued as against the individual defendants, and the verdict was entered only against the Town of Rotterdam.

Deputy Chief Alfred DeCarlo that Mr. Raucci once again had threatened to kill her and had recently purchased a gun. She reminded DeCarlo that she had an order of protection and requested that her husband be arrested. According to Ms. Raucci, De-Carlo suggested that the police could "do more for [her] than ... arrest [her] husband" and could train her to record her telephone conversations with Mr. Raucci to develop evidence against him. At DeCarlo's direction, she went to the Rotterdam Police station that evening, picked up the tape recorder, and received instruction on its use from Officer Wayne Calder, who was aware of her situation. Thereafter, Ms. Raucci was able to tape telephone conversations that included threats to kill her as well as admissions of ownership of a gun. On June 18, Ms. Raucci delivered the tapes to Calder, who played them in the absence of DeCarlo. Ms. Raucci testified that Calder told her that there was "plenty on the tape," but that he was not going to proceed until DeCarlo returned. Ms. Raucci telephoned the Rotterdam Police over the next two days in an attempt to locate De-Carlo, who was unavailable.

Ms. Raucci went to the Rotterdam Police station on Sunday, June 23, because Mr. Raucci had attempted to break into her apartment earlier that morning and threatened "to blow her head off." She signed an information charging Mr. Raucci with aggravated harassment by reason of his conduct of that day. *See* N.Y.Penal Law § 240.30 (McKinney 1989). DeCarlo told her that the police would arrest Raucci on Monday when a judge would be available for arraignment. When Ms. Raucci returned to her apartment, Mr. Raucci appeared in her parking lot and continued to threaten her. She called the police, and they arrested Mr. Raucci on the basis of the information signed earlier that day. As he was being arrested, Mr. Raucci asked the officers to contact Deputy Chief DeCarlo, Officer Calder, and Officer Robert DeCarlo, since they were his friends and knew about this marital dispute. He was arraigned the next day and released on bail of $500 by Justice Edward O'Connor of the Town of Rotterdam Justice Court. Jus-

tice O'Connor was not apprised of the existence or contents of the tapes or the circumstances in which they were obtained, nor, would it seem, was he aware of the entire history of the bitter dispute involving the Rauccis.

On June 28, DeCarlo called Ms. Raucci to tell her that Mr. Raucci had come to the police station with Chad earlier that day to deliver her car keys. She replied that she was continuing to receive telephone calls from her husband, who also had appeared and startled her in public places on two separate occasions during that week. When she asked him what he was doing with the tapes, DeCarlo said that "he was working on it." DeCarlo assured her that Mr. Raucci was only trying to break her psychologically and "in most cases like this what happened was the person usually turns the gun on themselves." DeCarlo told her that Mr. Raucci had been badgering Chad at the police station to tell the police about her male companion.

Two days later, Ms. Raucci was leaving for a trip to Lake George with Chad when she stopped to pick up her male companion, Mark Ference, at his home in Schenectady. Mr. Raucci, who had been following Ms. Raucci, stopped his car and waited as she proceeded to park her car. He then retrieved his rifle from his trunk. Mr. Raucci walked toward Ms. Raucci's car with the rifle and shot and wounded Ference as Ference approached Ms. Raucci's car. Chad screamed and jumped into Ms. Raucci's arms. Ms. Raucci pleaded with her estranged husband not to shoot because Chad was in the car. Nevertheless, Mr. Raucci shot inside the car, wounding Ms. Raucci and killing Chad.

In this section 1983 action, Ms. Raucci asserted claims against defendants for depriving Chad and her of their constitutional due process rights by failing to protect them from Mr. Raucci. *See* 42 U.S.C. § 1983 (1982). She also asserted state law negligence claims, alleging a special relationship that defendants breached by failing to act in a way that might have prevented the disastrous confrontation. Defendants moved for summary judgment on

both claims. The district court[2] granted defendants summary judgment only on the section 1983 claims. The court retained jurisdiction over the pendent state negligence claims because at the time of the dismissal discovery was completed and dispositive motions had been decided in this case, which was ready for trial.

At trial, Ms. Raucci discontinued the action against the individual police officer defendants. The jury returned a verdict in her favor against Rotterdam, awarding $275,000 for her personal injuries and $250,000 for the wrongful death of Chad. Rotterdam moved for judgment notwithstanding the verdict, a new trial, and remittitur of the wrongful death award. The district court denied the motions, holding that Ms. Raucci had made out a prima facie case of negligence by proving each element of a special relationship between the police department on the one hand and Ms. Raucci and Chad on the other. The court also held that the verdict was not clearly against the weight of the evidence before the jury, and that curative instructions removed any harm from the summation made on behalf of plaintiff. The court concluded that the jury was sufficiently charged on the elements of the special relationship and that Rotterdam's requested charges properly were excluded without any resulting prejudice. Finally, the court denied the motion for remittitur of the damages award for Chad's wrongful death because the court found the award was "not so excessive as to shock the judicial conscience" as compared with similar New York wrongful death awards.

## DISCUSSION

Defendants contend that the district court abused its discretion in exercising jurisdiction over the pendent state negligence claims after dismissing the federal claims. They assert that the court erred in not granting their motion for judgment notwithstanding the verdict because Ms. Raucci was unable to establish a prima facie case of negligence on the part of Rotter-

dam in the absence of proof of a special relationship. Specifically, defendants contend that Ms. Raucci did not prove that Rotterdam assumed an affirmative duty to act on her behalf, that the Rotterdam Police Department knew that inaction could lead to harm, that she justifiably relied on Rotterdam's affirmative undertaking to act, and that, as to Chad, there was some form of direct contact between Rotterdam and Chad. *See Cuffy v. City of New York*, 69 N.Y.2d 255, 260, 505 N.E.2d 937, 940, 513 N.Y.S.2d 372, 375 (1987). Defendants contend that the district court abused its discretion in not granting them a new trial because the jury charge was erroneous, and the summation made on behalf of plaintiff was prejudicial. Finally, they argue that the damage award of $250,000 for the wrongful death a six-year-old child is excessive and requires a new trial.

## I. Pendent Jurisdiction

A federal court has pendent jurisdiction over state law claims whenever a federal law claim confers subject matter jurisdiction on the court and both claims "derive from a common nucleus of operative fact." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Pendent jurisdiction is "a doctrine of discretion" for the district court. *Id.* at 726, 86 S.Ct. at 1139. "[T]he doctrine of pendent jurisdiction thus is a doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 618, 98 L.Ed.2d 720 (1988). Failure to dismiss a pendent claim after dismissing a federal claim "may be an abuse of the district court's discretion" especially when the state claim involves novel questions of state law. *Robison v. Via*, 821 F.2d 913, 925 (2d Cir.1987). But the dismissal of pendent claims is not always required when federal claims in an action are dismissed. *See Cohill*, 484 U.S. at 350 n. 7, 108 S.Ct.

---

**2.** Hon. Con G. Cholakis, *District Judge,* United States District Court for the Northern District of New York. The case was assigned to Judge Gagliardi for trial.

at 619 n. 7. The court must "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction" over the pendent claim. *Id.* at 350, 108 S.Ct. at 618.

■ Here, the district court weighed these factors and found that, despite the dismissal of the federal claim, judicial economy and convenience favored retention of jurisdiction. Cautioning that it did not wish to establish a precedent, the court noted in the "unique circumstances of this case," that the completion of discovery, the determination of the third dispositive motion in this case, and the readiness of the case for trial, all favored retaining jurisdiction. *See Financial Gen. Bankshares, Inc. v. Metzger,* 680 F.2d 768, 773 & n. 9 (D.C.Cir.1982) (extensive pretrial proceedings prior to dismissal of federal claims supports retention of pendent jurisdiction for reasons of judicial economy and convenience) (citing *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *Gem Corrugated Box Corp. v. National Kraft Container Corp.,* 427 F.2d 499, 501 n. 1 (2d Cir.1970); and other cases). This case merely applies recently settled New York municipal liability doctrine and does not involve novel legal questions. The court was familiar with the state law issues from the summary judgment motions. In light of the stage of the proceeding, the court, therefore, did not abuse its discretion in denying dismissal of the pendent claim.

The Supreme Court recognized in *Cohill* that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims." 484 U.S. at 350 n. 7, 108 S.Ct. at 619 n. 7. We find only that the case before us is not "the usual case," and that denial of pendent jurisdiction here would be a waste of judicial resources, given the extensive proceedings involving the pendent claims prior to the dismissal of the federal claim.

## II. Proof of Special Relationship

This Court, in reviewing the denial of motions for judgment notwithstanding the verdict, "must determine whether the evidence, viewed in the light most favorable to the party that secured the verdict, was sufficient to allow a reasonable juror to arrive at the verdict rendered." *Schwimmer v. Sony Corp. of Am.,* 677 F.2d 946, 952 (2d Cir.), *cert. denied,* 459 U.S. 1007, 103 S.Ct. 362, 74 L.Ed.2d 398 (1982). Viewing the evidence in this case in the light most favorable to Ms. Raucci, the evidence was sufficient to prove each element of the special relationship. *See Bauer v. Raymark Indus., Inc.,* 849 F.2d 790, 792 (2d Cir.1988); *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 688–89 (2d Cir.1983)..

Generally, a municipality is not liable under New York law for failing to provide an individual with police protection. *Cuffy,* 69 N.Y.2d at 260, 505 N.E.2d at 939, 513 N.Y. S.2d at 374. "[I]n order for liability to be imposed upon a municipality ... there must be proof of a 'special relationship' between that person and the municipality." *Kircher v. City of Jamestown,* 74 N.Y.2d 251, 253, 543 N.E.2d 443, 444, 544 N.Y.S.2d 995, 996 (1989) (citing *Cuffy*). The "special duty" imposed by that relationship is recognized only in a "narrow class of cases." *See Cuffy,* 69 N.Y.2d at 260, 505 N.E.2d at 940, 513 N.Y.S.2d at 375; *Sorichetti v. City of New York,* 65 N.Y.2d 461, 468, 482 N.E.2d 70, 75, 492 N.Y.S.2d 591, 596 (1985). The reason for limiting this exception is that a municipality's duty to provide police protection is owed to the public at large rather than to any individual or class of citizens, and questions of resource allocation, such as how much protection a municipality must provide to an individual or class, are left to the discretion of the municipal policy makers. *See Kircher,* 74 N.Y.2d at 256, 543 N.E.2d at 445, 544 N.Y. S.2d at 997; *Cuffy,* 69 N.Y.2d at 260, 505 N.E.2d at 939–40, 513 N.Y.S.2d at 374.

■ The elements of the special relationship are

(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the

party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking.

*Cuffy*, 69 N.Y.2d at 260, 505 N.E.2d at 940, 513 N.Y.S.2d at 375 (citations omitted). Once the special relationship is found to exist between the municipality and the injured person, the actions of the municipality's agents will be subject to a reasonableness standard. *Sorichetti*, 65 N.Y.2d at 470, 482 N.E.2d at 76, 492 N.Y.S.2d at 597. "Whether a special duty has been breached is generally a question for the jury to decide," and "whether the municipality has acted reasonably depends upon the circumstances of the particular case." *De Long v. County of Erie*, 60 N.Y.2d 296, 306, 457 N.E.2d 717, 722, 469 N.Y.S.2d 611, 616 (1983) (citations omitted).

### A. Assumption of Duty

█ Defendants assert that there was no evidence of Rotterdam assuming a duty to act through promises or actions of the Rotterdam Police Department. They contend that they fulfilled any obligation they had to Ms. Raucci by arresting her husband on June 23.

The evidence, however, supports the verdict as to this first element. Deputy Chief DeCarlo told Ms. Raucci that the police "could do more" than what she had requested of them and suggested the taping of the harassing telephone calls. The Rotterdam Police trained her to record these calls. Despite the acknowledgment that the tapes provided sufficient evidence for a charge of aggravated harassment, and despite the fact that they evidenced the lethal character of Mr. Raucci's threats, the police did nothing with them. The June 23 information the police drafted for Ms. Raucci merely referred to "numerous telephone calls" by Mr. Raucci but only as background for the charge arising from the incident that took place on that day. Neither the tapes nor their contents were presented to Justice O'Connor during Raucci's arraignment. DeCarlo said on June 28 that he was still working on the tapes, implying that the June 23 arrest was not the end of the police department's role. The police also knew, beginning in late May, that Ms. Raucci had an order of protection (having suggested that she obtain the order) and that these harassing telephone calls constituted violations of the order. "[W]hen the police are made aware of a possible violation [of an order of protection], they are obligated to respond and investigate, and their actions will be subject to a 'reasonableness' review in a negligence action." *Sorichetti*, 65 N.Y.2d at 470, 482 N.E.2d at 76, 492 N.Y.S.2d at 597.

### B. Knowledge That Inaction Would Lead to Harm

Defendants claim that the record is barren of any proof that the Rotterdam Police Department knew that Mr. Raucci was a violent person or otherwise harmful and therefore they were unaware that inaction would lead to harm. The Rotterdam Police Department, however, was well aware of Mr. Raucci's threats against Ms. Raucci's life: from her statements to them; from the recorded telephone conversations which revealed that Mr. Raucci was armed and threatening; and from physical injuries which corroborated her allegations. At the suggestion of Officer Bethmann, Ms. Raucci obtained an order of protection against Mr. Raucci, and she reminded the Rotterdam Police Department of this order whenever she contacted them concerning Raucci's harassment. An order of protection

> evinces a preincident legislative and judicial determination that its holder should be accorded a reasonable degree of protection from a particular individual. It is presumptive evidence that the individual whose conduct is proscribed has already been found by a court to be a dangerous or violent person and that violations of the order's terms should be treated seriously.

*Sorichetti*, 65 N.Y.2d at 469–70, 482 N.E.2d at 75–76, 492 N.Y.S.2d at 596–97. The police thus were aware of Mr. Raucci's dangerousness. The situation here thus is

distinguishable from that described in *Yearwood v. Town of Brighton,* 101 A.D.2d 498, 499–500, 475 N.Y.S.2d 958, 959–60 (4th Dep't), *aff'd mem.,* 64 N.Y.2d 667, 474 N.E.2d 612, 485 N.Y.S.2d 252 (1984), where the Brighton Police Department had only one contact with plaintiff and her husband before he set fire to her home. In the case at bar, the police were familiar with the marital situation from their substantial contacts with both parties. *Cf. id.* at 502, 475 N.Y.S.2d at 961. The jury had sufficient evidence of the department's knowledge that its inaction could lead to harm.

### C. Direct Contact With Rotterdam's Agents

Defendants concede that there was proof of direct contact between the Rotterdam Police Department and Ms. Raucci. They assert, however, that there was no contact between Chad and the police department and that, in fact, there was no threat against Chad's life by Mr. Raucci. They distinguish this case from *Sorichetti,* noting that the New York City Police Department there was aware of Sorichetti's threats against both the mother and the child, while in the case at bar there was no indication that Chad's life was ever in danger.

One reason for the direct contact requirement is to provide a rational limit on the number of citizens "to whom the municipality's 'special duty' extends." *Cuffy,* 69 N.Y.2d at 261, 505 N.E.2d at 940, 513 N.Y.S.2d at 375. "[T]he proper application of the 'direct contact' requirement depends on the peculiar circumstances of each case, all of which must be considered in light of the policies underlying the narrow 'special duty' doctrine." *Id.* at 262, 505 N.E.2d at 941, 513 N.Y.S.2d at 376.

*Sorichetti* deviated from the direct contact element to allow an injured child to recover though only her mother contacted the New York City Police Department. *Sorichetti,* 65 N.Y.2d at 469, 482 N.E.2d at 75, 492 N.Y.S.2d at 596; *Cuffy,* 69 N.Y.2d at 261–62, 505 N.E.2d at 940–41, 513 N.Y.S.2d at 375. The New York Court of Appeals in *Sorichetti* found that orders of protection issued for the mother protected the equally threatened daughter in her custody. *Sorichetti,* 65 N.Y.2d at 469, 482 N.E.2d at 75, 492 N.Y.S.2d at 596. In later cases, that court has explained that in *Sorichetti* it was applying the direct contact requirement with some flexibility by using the mother's contact as a substitute for the child's direct contact with the police, *Kircher,* 74 N.Y.2d at 257, 543 N.E.2d at 446, 544 N.Y.S.2d at 998, and by recognizing the "close relationship between the interests of the mother and those of the child," *Cuffy,* 69 N.Y.2d at 261, 505 N.E.2d at 941, 513 N.Y.S.2d at 375. The "outstanding judicial order of protection" in *Sorichetti* "signifi[ed] the municipality's prior involvement in the domestic turmoil that ultimately led to the infant's injuries, thus providing a justification for relaxing the direct contact requirement." *Kircher,* 74 N.Y.2d at 257–58, 543 N.E.2d at 446–47, 544 N.Y.S.2d at 998–99. The court in *Cuffy* held that the injured mother and son had sufficient contact with the police to create a special relationship because the father, who actually talked to the police about harassment by his tenants, was concerned about his family's safety when he contacted the police. *Cuffy,* 69 N.Y.2d at 262, 505 N.E.2d at 941, 513 N.Y.S.2d at 376.

In this case, Ms. Raucci initially approached the Rotterdam Police Department with Chad. She obtained an order of protection which, under *Sorichetti* and its progeny, extended to her children insofar as her contacts with the Rotterdam Police Department were concerned. Officers of the Rotterdam Police Department had seen Chad and knew who he was. They also knew from the tapes and from observing Mr. Raucci in the police station on June 28 that Chad was the object of a custody dispute between the couple. The district court did not err in determining that the element of direct contact was established as to Chad as well as his mother.[3]

3. Chad was with his mother when she came to the police station on May 13; when she came to the station again on June 1 claiming that Mr. Raucci attempted to run her off the road and

### D. *Justifiable Reliance on Rotterdam's Affirmative Assumed Duty*

Defendants contend that their arrest of Mr. Raucci on June 23 fulfilled any obligation owed to Ms. Raucci, and that DeCarlo's June 28 statements did not create any promises which Ms. Raucci could rely upon. They contend that her actions after June 28 belie any assertion of reliance on DeCarlo's statements, since she permitted Mr. Raucci to visit the children in her presence.

The reliance element is "critical in establishing the existence of a 'special relationship'" because it provides "the essential causative link between the 'special duty' assumed by the municipality and the alleged injury." *Cuffy*, 69 N.Y.2d at 261, 505 N.E.2d at 940, 513 N.Y.S.2d at 375. Defendants' contention rests on the fact that Ms. Raucci did not change her routine for the seven days between Mr. Raucci's release on bail and the shooting. According to defendants, Ms. Raucci had to avoid Mr. Raucci in order to establish reliance on the Rotterdam Police Department's assurances. The district court found, to the contrary, that the failure of Ms. Raucci to change her routine was a true indicator of her reliance on a perceived promise of police protection. On June 28, DeCarlo told Ms. Raucci that he was still working on the tapes, implying that the case was not closed with the police after Raucci's arrest and release as far as the police were concerned. Obviously, the tapes would have been key evidence in any further proceeding against Mr. Raucci. Ms. Raucci relied on DeCarlo's statement, believed that the police either would arrest Mr. Raucci again or would otherwise protect her, and was "lulled ... into a false sense of security" by DeCarlo's statement. *See Cuffy*, 69 N.Y.2d at 261, 505 N.E.2d at 940, 513 N.Y.S.2d at 375.

Based on the foregoing, there was sufficient evidence of all of the elements of a special relationship between Ms. Raucci

and Rotterdam not to grant judgment notwithstanding the verdict. Further, the court correctly found that the verdict was not against the weight of the evidence. *See Smith v. Lightning Bolt Prod., Inc.*, 861 F.2d 363, 370 (2d Cir.1988).

### III. Wrongful Death Award

■ We are constrained to give due deference to the factfinding role of the jury and to the role of the district court in declining the motion for remittitur of the wrongful death award. *See Martell v. Boardwalk Enters., Inc.*, 748 F.2d 740, 750 (2d Cir.1984). The district court's refusal to set aside or reduce a jury award will be overturned only for abuse of discretion. *Id.* "Nevertheless, a judgment cannot be upheld where the damages awarded are so excessive 'as to shock the judicial conscience.'" *Id.* (quoting *United States ex rel. Larkins v. Oswald*, 510 F.2d 583, 589 (2d Cir.1975)). To determine whether an award of damages is shockingly excessive when the law of a particular state is applied, we must examine and compare the challenged award with awards made in similar cases in the courts of that state. *See id.*

The New York Estates, Powers and Trust Law requires only "fair and just compensation for the pecuniary injuries resulting from the decedent's death." N.Y. Est. Powers & Trusts Law § 5–4.3(a) (McKinney 1981 & Supp.1990). Included in the calculation of that damages award for a decedent minor is the "probable, or even possible, benefits which might inure to the parents from their child's entire life," *Franchell v. Sims*, 73 A.D.2d 1, 5, 424 N.Y.S.2d 959, 962 (4th Dep't 1980), and lost future financial support, *Smith v. Hub Mfg., Inc.*, 634 F.Supp. 1505, 1511 (N.D.N.Y.1986). "But in any wrongful death action, especially one involving a child of tender years, the absence of dollars and cents proof of pecuniary loss does not rele-

demanded to take Chad; and when, on June 23, Mr. Raucci attempted to enter Ms. Raucci's apartment and threatened to "blow her head off." The Rotterdam Police thus were well aware that Chad, a child of tender years and the center of a custody dispute between his parents,

was usually accompanied by his mother. It was therefore entirely foreseeable to the police that Chad would be within the line of fire if Mr. Raucci made good his threats against Ms. Raucci.

gate the distributees to recovery of nominal damages only." *Parilis v. Feinstein*, 49 N.Y.2d 984, 985, 406 N.E.2d 1059, 1060, 429 N.Y.S.2d 165, 166 (1980) (mem.) (citations omitted). Pecuniary injury often is fixed by a jury on the basis of little direct evidence. *Id.* In the New York courts, no award in excess of $100,000 for the death of a child has been sustained. *See, e.g.,* *Coffey v. Callichio*, 136 A.D.2d 673, 523 N.Y.S.2d 1011 (2d Dep't 1988) (mem.) ($300,000 reduced to $100,000 for sixteen-year-old decedent); *Delosovic v. City of New York*, 143 Misc.2d 801, 813–14, 541 N.Y.S.2d 685, 693–94 (Sup.Ct.1989) (wrongful death awards of $100,000 each for the deaths of five-year-old and two-year-old children, factoring recent inflation). Therefore, we find that $250,000 awarded here is shockingly excessive as a matter of New York law and should be reduced. Accordingly, we remand for a new trial on the issue of the amount of the wrongful death damages unless plaintiff agrees to remit all of the wrongful death damages award in excess of $100,000. *See Martell*, 748 F.2d at 755.

### IV.   Motion for New Trial

▮▮▮   Plaintiff's counsel stated in summation that defendants failed to respond in any way to the tapes. Defendants contend that this statement confused the jury. The district court properly charged the jury that the attorney's arguments were not evidence, and any error was thereby cured. Defendants sought a charge that the jury had to find that each element of the special relationship was established separately by the evidence, and also requested a charge that Rotterdam was not liable for the acts of Justice O'Connor in arraigning Mr. Raucci. The court sufficiently charged that to find defendants liable for negligence the elements of a special relationship had to be proved. The court properly defined those elements and correctly denied the motion for a new trial on the jury charge and summation issues.

### CONCLUSION

Accordingly, we affirm the judgment of the district court, save the wrongful death award. As to the amount of that award, we reverse and remand for a new trial, subject to remittitur of the amount in excess of $100,000.

VAN GRAAFEILAND, Circuit Judge, concurring in part and dissenting in part:

I agree with my colleagues that the judgment in favor of Kathie E. Raucci individually should be affirmed. I also agree that the judgment in favor of Kathie as administratrix cannot stand. However, I would go further than my colleagues; I believe that the action to recover for the wrongful death of Chad Raucci should be dismissed.

Under well-established New York law, actionable negligence can arise only out of the breach of a duty owed to the person on whose behalf recovery is sought. *Mink v. Keim*, 291 N.Y. 300, 304, 52 N.E.2d 444 (1943). That duty must be commensurate with known dangers. *Caldwell v. Village of Island Park*, 304 N.Y. 268, 274, 107 N.E.2d 441 (1952). "[T]he same act of a defendant may be a breach of duty toward one person while not a breach of duty toward another." *Levine v. City of New York*, 309 N.Y. 88, 92–93, 127 N.E.2d 825 (1955). Section 5–4.1 of New York's Estate Powers and Trust Law (17B McKinney) provides that the personal representative of a decedent "may maintain an action to recover damages for a wrongful act, neglect or default which caused the decedent's death against a person who would have been liable to the decedent by reason of such wrongful conduct if death had not ensued." *See Prink v. Rockefeller Center, Inc.*, 48 N.Y.2d 309, 315, 422 N.Y.S.2d 911, 398 N.E.2d 517 (1979). Although there may have been an actionable breach of a special duty owed by the Town of Rotterdam to Kathie Raucci individually, I can find no breach of a similar special duty owed the deceased infant that would permit recovery by Kathie Raucci as administratrix.

Article 8 of New York's Family Court Act establishes a civil proceeding the purpose of which is to protect family members from domestic violence. A proceeding un-

der this Article is originated by a petition alleging that the respondent "assaulted or attempted to assault his or her spouse, parent, child or other member of the same family or household or engaged in disorderly conduct, harassment, menacing or reckless endangerment toward any such person...." Fam.Ct.Act § 821(1)(a). The Practice Commentary under section 821, citing *Anderson v. Anderson*, 25 A.D.2d 512, 267 N.Y.S.2d 75 (1966), states that "due process (as well as the orderly administration of justice) require that the petition conform to standard rules of pleading."

Kathie Raucci's petition, which initiated the Family Court proceeding, did not allege that her husband had mistreated her son in any manner. Indeed, there was no way in which such an allegation honestly could have been made. The record establishes beyond dispute that Joseph Raucci was devoted to his son; that although he had formally agreed when he and Kathie separated that she should have custody of the boy, he retained broad rights of visitation. During almost the entire period at issue herein, Joseph saw his son on an average of four times a week, sometimes himself babysitting, and sometimes taking the boy off other babysitters' hands for short visits. The Order of Protection was issued by the Family Court pursuant to stipulation, and the order's injunctive provisions were directed to both Joseph and Kathie Raucci. Each was directed not to harass, annoy or alarm the other. Neither was directed not to annoy, harass or injure the son. The only mention of the son was a reference to Joseph's right of visitation, which was ordered continued.

I take issue with my colleagues' statement that the child's father attempted to run Kathie's car off the road while she was driving with her son and that this was part of a custody dispute between the parties. As above stated, Joseph already had signed a separation agreement with Kathie which gave custody of his son to Kathie subject only to his right of visitation. The true story concerning Joseph's "attempt to run her car off the road" is a far cry from Kathie's lurid claim. Her testimony on cross-examination was that, while she was stopped at an intersection waiting for a red light to change, Joseph pulled along side her and told her to pull over to the right so that he could take his son with him. Instead of doing that, Kathie went straight ahead and Joseph turned down a side street behind her.

Q So he did not run you off the road; is that correct?

A It might be.

At the close of the proof, counsel for the Town moved to dismiss the death claim "because there was no proof that there was ever any threat to the child which would give rise to a special relationship or special duty...." The district court denied the motion, stating "I believe that the children are encompassed within the ambit of the protection afforded to the parent and I think that is specific in the *Sorichetti* case." Counsel for plaintiff agreed: "We are proposing as a matter of law that you rule and instruct that if Kathy Raucci is covered by the special duty, then Chad is." This is the interpretation of New York law that the district court adopted in its charge.

Plaintiff's complaint alleged that the plaintiff, Kathie Raucci, had obtained a Family Court order "to protect plaintiff from threats and physical harm by her husband"; that the defendants "promised special protection of plaintiff from her husband"; that "the special relationship between plaintiff and defendants and the special obligation of defendants to protect plaintiff covered and was applicable to the plaintiff's son"; that defendants' acts constituted "a breach of the special relationship between plaintiff and defendants and were the proximate cause" of the death of plaintiff's son.

Referring to the complaint, the district court charged the jury that it alleged the existence of a special relationship between the Town and Kathie Raucci. The court continued:

Ordinarily, a municipality in New York is not liable for failure to provide police protection. There is an exception, however, to this rule when there exists a

special relationship between the municipality and the plaintiff.

...

If you should find that the special—a special relationship existed between the defendant and plaintiff Kathy E. Raucci, then you may find that such special relationship extended to her son Chad Joseph Raucci.

In contrast to my colleagues, I do not believe that the district court correctly interpreted the New York Court of Appeals' decision in *Sorichetti v. City of New York*, 65 N.Y.2d 461, 492 N.Y.S.2d 591, 482 N.E.2d 70 (1985). In that case, the plaintiffs' theory of recovery as expressed by Judge Alexander was that the City "negligently failed to take Frank Sorichetti into custody or otherwise prevent his assault upon his daughter after being informed that he may have violated a Family Court order of protection and *that he had threatened to do harm to the infant.*" *Id.* at 463, 492 N.Y.S.2d 591, 482 N.E.2d 70 (emphasis supplied). Judge Alexander continued:

To uphold the award of damages in this case, we must determine whether a special relationship existed between the infant and the municipality by virtue of (1) the issuance of a judicial order of protection directing Frank Sorichetti to refrain from threatening or assaulting his wife and providing that the order constituted authority for a peace officer to arrest a person charged with violating its terms; and (2) the police department's knowledge of Frank Sorichetti's history of assaultive and abusive conduct toward his family and *his immediate threats of harm to his daughter and its response to Josephine Sorichetti's pleas for assistance.*

*Id.* at 464, 492 N.Y.S.2d 591, 482 N.E.2d 70. (emphasis supplied)

The proof in that case established that, to the knowledge of the police, the infant's father had threatened to kill the infant on a number of occasions. On November 8, 1975, a Saturday, the infant's mother delivered the infant to the father in front of the 43rd Precinct in compliance with the weekend visitation rights granted the father by the Family Court. As the father was walking away with the child, he threatened that, before the weekend was up, the child would be making "the sign of the cross" which the mother correctly interpreted as a threat of death. *Id.* at 465, 492 N.Y.S.2d 591, 482 N.E.2d 70. The mother immediately asked the police for help, which was denied. She made four more frantic requests during the following day, all of which were refused. *Id.* at 466–67, 492 N.Y.S.2d 591, 482 N.E.2d 70. Around 7:00 p.m. on Sunday, the father inflicted the injuries on the daughter which gave rise to the litigation. *Id.* at 467, 492 N.Y.S.2d 591, 482 N.E.2d 70.

The *Sorichetti* court held that "[t]he fact that an injury occurs because of a violation of an order of protection does not in itself create municipal liability." *Id.* at 470, 492 N.Y.S.2d 591, 482 N.E.2d 70. It held, however, that a special relationship existed between the City and the infant which arose out of

(1) the order of protection; (2) the police department's knowledge of Frank Sorichetti's violent history, gained through and verified both by its actual dealings with him, the existence of the order of protection, and its knowledge of the specific situation in which the infant had been placed; (3) its response to Josephine Sorichetti's pleas for assistance on the day of the assault; and (4) Mrs. Sorichetti's reasonable expectation of police protection.

*Id.* at 469, 492 N.Y.S.2d 591, 482 N.E.2d 70.

As explained by the New York Court of Appeals in a subsequent opinion, its deviation from the requirement of a "direct contact" between the infant and the City in the *Sorichetti* case "may be explained by the close relationship between the interests of the mother and those of the child, as well as by the fact that the mother's contact with the police had been initiated solely for the purpose of obtaining protection for the child, who was herself helpless." *Cuffy v. City of New York*, 69 N.Y.2d 255, 261–62, 513 N.Y.S.2d 372, 505 N.E.2d 937 (1987). See also *Kircher v. City of Jamestown*, 74

N.Y.2d 251, 258 n. 2, 544 N.Y.S.2d 995, 543 N.E.2d 443 (1989), where the Court said:

> Another factor explaining our decision in *Sorichetti* was the police department's specific "knowledge of Frank Sorichetti's violent history, gained through and verified both by its actual dealings with him, the existence of the order of protection, and its knowledge of the specific situation in which the infant had been placed" (*Sorichetti v. City of New York*, 65 N.Y.2d 461, 469, 492 N.Y.S.2d 591, 482 N.E.2d 70).

The facts in the instant case differ markedly from those of *Sorichetti*. Chad's mother and father were living apart pursuant to a separation agreement which expressly recognized the existence of a "close relationship" between the children and their father. The order of protection, upon which my colleagues place heavy reliance, specifically provided for visitation between the infant and his father. The record is clear that the father was devoted to his son. The father did, however, become extremely upset with his wife because, although still married to him, she had taken up with another man. There is no proof whatever of police knowledge that the infant Chad was at any time in danger from his father.

Q  Ma'am, my question is did you ever feel that your husband would harm Chad?

A  I didn't think he would actually harm Chad.

Q  And you never requested any protection for your son; is that correct?

A  That's correct.

The infant was killed when, after Chad's father shot the mother's paramour, Chad was struck by a shot aimed at his mother. There is no contention that the father intended to kill his son. The substance of my colleagues' holding appears to be that, although Chad's mother did not believe that Chad needed police protection and did not ask for it, the police nonetheless should have provided it because Chad's father turned out to be a poor marksman.

My interpretation of New York law convinces me that the district court should have dismissed the death action in response to the Town's motion. At the very least, the Town is entitled to a new trial in which the jury would be charged correctly on the applicable New York law.[1]

---

1. The differing interpretations of state law by the majority and the dissent herein illustrate vividly why the district court should not have retained jurisdiction of the state cause of action for wrongful death when the federal cause of action was dismissed. *See Robison v. Via*, 821 F.2d 913, 925 (2d Cir.1987).