896 F.Supp. 1313 (1995)
John T. HOGAN, Plaintiffs,
v.
James FRANCO, Police Officer; John Griffith, Police Officer; Francis Horgan, Police Officer; John Doe, Police Officer; Benny Rotundo, Chief of Police; and City of Utica, New York; Defendants.
No. 93-CV-0832.
United States District Court, N.D. New York.
September 18, 1995.
*1314 *1315 Lockwood & Golden, Utica, NY (Stephen Lockwood, of counsel), for plaintiff.
Joseph H. Hobika, Corporation Counsel, Office of Corporation Counsel, City of Utica, Utica, NY (John P. Orilio, Assistant Corporation Counsel, of counsel), for defendants.

MEMORANDUM, DECISION & ORDER
HURD, United States Magistrate Judge.

I. INTRODUCTION.

The above titled action was tried in Utica, New York, between June 5, and June 9, 1995. The jury returned a verdict in favor of plaintiff John T. Hogan ("Hogan" or "plaintiff") on federal claims pursuant to 42 U.S.C. § 1983: (1) against police officer James Franco ("Franco") for excessive use of force in handcuffing plaintiff; (2) against Police Officer John Griffith ("Griffith") for deliberate indifference to plaintiff's serious medical needs;[1] (3) against Police Officer Francis Horgan ("Horgan") for use of excessive force in beating plaintiff with a baton, use of excessive force in driving a police van with plaintiff in the back, and being deliberately indifferent to his serious medical needs; (4) against Chief of Police Benny Rotundo ("Chief Rotundo") for failure to properly train, supervise and discipline police officers in his charge; and (5) against the City of Utica for failure to properly train, supervise and discipline its police officers. The jury verdict also included an award for supplemental state law claims (28 U.S.C. § 1367): (1) against Horgan for negligently driving a police van with plaintiff in the back, and assault on plaintiff; and (2) against Franco for assault on plaintiff. The jury awarded plaintiff a total of $200,000 in compensatory damages for all claims. The jury did not make an award of punitive damages against any individual defendant.

A. Motions.

Defendants presently move this court for judgment as a matter of law, pursuant to Fed.R.Civ.P. 50(b); or in the alternative, a new trial pursuant to Fed.R.Civ.P. 59; or in the alternative, remittitur as to the damages awarded plaintiff. Defendants move the court on the following grounds:
1. The evidence was insufficient to sustain the finding that defendants Horgan or Franco used excessive force;
2. The evidence was insufficient to sustain the finding of a municipal policy or practice of failing to properly train, supervise, or discipline its police officers;
3. The award of compensatory damages was excessive and unsupported by the evidence.
No direct motion has been brought with respect to the jury's verdict on the federal claims of deliberate indifference against Horgan, the state law verdicts of assault against both Horgan and Franco, or of negligence against Horgan. However, these claims will be discussed and are similar if not identical to the elements of excessive force and supervisory or municipal liability issues.[2] Oral *1316 argument was heard by both parties on July 13, 1995.

B. Trial.

Viewing the evidence in the light most favorable to the plaintiff as the court must in a motion for judgment as a matter of law, McGuigan v. CAE Link Corp., 851 F.Supp. 511, 513 (N.D.N.Y.1994) (citing Samuels v. Air Transport Local 504, 992 F.2d 12, 14 (2d Cir.1993)), the following are the trial facts.
Plaintiff was arrested on the night of July 4, 1992, after resisting the confiscation of alcohol at a public fireworks display. He was thrown against a fence and handcuffed by Franco in a manner which allowed the handcuffs to tighten with movement. He was then escorted to a police van for transportation to the police station. He was placed in the back of the van which was driven by Horgan. After the van stopped and acquired another arrestee, Guy Sterling ("Sterling"), Horgan drove the van to the station. The ride knocked plaintiff about, injuring his lower back because: (1) Horgan drove in a wild and reckless manner; (2) the handcuffs held plaintiff's arms behind his back and prevented him from steadying or otherwise protecting himself; and (3) the van contained neither restraints to keep plaintiff from smashing into the hard metal walls and wooden benches, nor padding to soften the blows as plaintiff was tossed about. While being hurtled around the van, plaintiff cursed Horgan, as well as requesting him to stop.
After they arrived at the police station, Horgan, in response to the verbal attack from plaintiff during the ride to the station, beat plaintiff with a baton before placing him, injured and in need of medical assistance, in a holding cell. Horgan ignored plaintiff's request for medical aid. When other detainees in the holding cell requested medical attention for plaintiff, they became targets for hot coffee, cold water, soda, and insults thrown by other officers who should have responded with assistance. Plaintiff was also struck with a baton by an unidentified officer while he was in the holding cell.
The next day, July 5, 1992, after a change of shifts at the police station, plaintiff, still in a stupor from his injuries, was taken to the emergency room at a nearby hospital where his injuries were treated and he was released. Photographs were taken at the hospital of a laceration on his leg and severe bruises on his chest caused by Horgan's baton. (See Dr. William Parker Trial Test. Tr. at 13-14 (hereinafter Dr. Parker Tr.) (crisscross bruise on plaintiff's chest was caused by a "long, thin, hard object" that could have been a police baton).) Plaintiff has returned to the emergency room and visited physicians for injuries to his wrist (a tingling and permanent loss of sensation caused by the extreme pressure the handcuffs placed on sensitive nerves) and lower back (a chronic pain which may be permanent). Plaintiff suffered emotional distress due to fear of the police, and experienced trouble sleeping after his arrest.
When plaintiff returned to the police station to lodge a complaint on July 6, 1992, he was interviewed by Deputy Chief Michael Taurisano ("Deputy Chief Taurisano"). Deputy Chief Taurisano interviewed plaintiff about the events that led to his injuries, and also had photographs taken of the chest bruises. Captain Pasquale Benzo ("Benzo") was assigned to investigate the incident. The records show that Benzo did interview Horgan concerning the incident. However, the interview apparently consisted of little more than asking Horgan if he had beaten the plaintiff, and accepting his reply and report that he had not. The investigation was brief, and Benzo never interviewed the plaintiff.
*1317 The following is a summary list of some of the evidence produced at trial that supports the jury verdict.

1. Evidence of defendants' use of excessive force and of damages suffered by the plaintiff:
a. Plaintiff: (i) testified that Franco handcuffed him extremely tightly; (ii) testified that he was battered against the metal and/or wood interior of the police van due to the wild and reckless driving of Horgan; (iii) testified that Horgan beat him repeatedly with a police baton; and (iv) testified to the nature and extent of his injuries.
b. William Parker, M.D. ("Dr. Parker"), who treated plaintiff in the emergency room, testified that the injuries to plaintiff's wrist, chest and leg, suffered before he was brought to the emergency room from the police station, were serious, and likely caused by an assault.
c. Leroy H. Cooley, M.D. ("Dr. Cooley"), the physician that treated plaintiff's wrist injury and examined his back, testified that, in his opinion, the injury to plaintiff's wrist was permanent and had been caused by being handcuffed too tightly; and that the injury to plaintiff's back might be permanent, and could have been caused by being thrown around the back of a van and/or being beaten with a baton.
d. Sterling, who was brought into the police station with plaintiff, testified that plaintiff was hit once with a baton while in the holding cell. He could not identify the officer.
e. Robert M. Roberts and Edward F. Roberts ("the Roberts"), who were placed in the holding cell with plaintiff, testified that plaintiff (i) was injured and in a stupor when they arrived at the holding cell; and (ii) was denied medical treatment despite their requests to officers that he receive such treatment.
f. Photo evidence showed plaintiff's injuries, after leaving the police department, while at the hospital, including serious bruises on the chest and a cut on the leg.
g. Photo evidence showed plaintiff's injuries, including serious bruises on the chest, at the time he entered the police station the following day to file a complaint against Horgan.
h. Franco's testimony revealed that he did not remember whether or not he had handcuffed plaintiff properly.

2. Evidence of supervisory or municipal liability:
a. Chief Rotundo testified that: (i) the police department gives no formal training in use of the police van; (ii) detainees are normally transported in the van while handcuffed; (iii) he delegated the authority to purchase the van with no padding or restraints, aware that it would be used to transport handcuffed detainees; (iv) the police department has no formal procedures for handling complaints of police brutality; (v) the police department does not index such complaints; (vi) informal investigations of complaints are conducted by fellow officers; (vii) to his knowledge, Benzo did not interview plaintiff; and (viii) he did not believe it necessary for Benzo to interview the plaintiff.
b. Horgan testified that he was not formally trained in the use of the van in which he transported plaintiff to the police department.
c. The Roberts, who were placed in the police department holding cell with plaintiff, testified that in response to their requests that plaintiff be given medical attention due to his obvious injury and semi-consciousness, officers threw coffee, soda and water on them and told them to be quiet.
d. Dr. Parker testified that he regularly receives emergency room patients complaining of physical abuse by the Utica Police.
e. Plaintiff testified that his requests for medical assistance were ignored.

II. DISCUSSION

A. Rule 50(b)  Judgment as a Matter of Law.

This court can only grant judgment as a matter of law on a claim if that claim "cannot under controlling law be maintained." Fed. R.Civ.P. 50(a)(1). Judgment as a matter of *1318 law is to be granted "only when, viewing the evidence most favorably to the [nonmoving party], there can be but one conclusion as to the verdict that reasonable men could have reached." Weldy v. Piedmont Airlines, Inc., 985 F.2d 57, 59-60 (2d Cir.1993) (citations and quotations omitted); Slade v. Whitco Corp., 810 F.Supp. 396, 398 (N.D.N.Y.1993), reaff'd in part, 811 F.Supp. 71 (N.D.N.Y. 1993). "The nonmovant must be given the benefit of all reasonable inferences." Weldy, 985 F.2d at 60. The defendants fulfilled the procedural necessity of moving for judgment as a matter of law before the case was submitted to jury. See Fed.R.Civ.P. 50(a)(2), (b); Slade, 810 F.Supp. at 398.

1. Officers Franco and Horgan.

Franco and Horgan have moved for judgment as a matter of law due to what they consider insufficient evidence to sustain a finding that they used excessive force.
Ample evidence was presented of use of excessive force upon Hogan. Hogan's own testimony accused Franco of applying the handcuffs far too tightly, and Horgan of beating him with a baton several times during his custody, and of deliberately driving the police van recklessly throwing him about. Fellow detainee Sterling corroborated, at least in part, this testimony. Dr. Parker's testimony concluded that Hogan's injuries resulted from a forcible assault. Dr. Cooley's findings were of wrist injuries as a result of excessively tight handcuffs. Photo evidence showed injuries resulting from use of force. The question that must then be answered is, "was this force excessive?"
In Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme court held that "[all] claims that law enforcement officers have used excessive force  deadly or not  in the course of an arrest, investigatory stop, or other `seizure' of a free citizen should be analyzed under the Fourth Amendment and its `reasonableness' standard ..." Id. at 395, 109 S.Ct. at 1871, 104 L.Ed.2d at 454 (emphasis in original); see also Finnegan v. Fountain, 915 F.2d 817, 823 (2d Cir.1990). Moreover, when analyzing such a claim, the proper application of the Fourth Amendment's test of reasonableness "[r]equires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396, 109 S.Ct. at 1872, 104 L.Ed.2d at 455 (citing Tennessee v. Garner, 471 U.S. [1, 8-9, 105 S.Ct. 1694, 1699-1700, 85 L.Ed.2d 1, 7-8 (1985)] (the question is "whether the totality of the circumstances justifie[s] a particular sort of ... seizure")); see also Finnegan, 915 F.2d at 823.
Johnson, 1995 WL 319943, at *24.
The original act that started this series of events was completely nonviolent. Plaintiff was confronted and arrested for violating the city open container ordinance  not even a misdemeanor. Plaintiff never posed a threat to any police officer. No officer was ever in any danger. No risk of flight existed. Although plaintiff was charged and convicted of resisting arrest, even the officers' testimony demonstrated that his efforts in this regard were pathetic rather than dangerous. In any event, no one claimed that the plaintiff was injured while resisting arrest or attempting to flee. No reasonable explanation for his injuries was ever offered. This evidence, read in the light most favorable to the nonmovant, allows reasonable jurors to come to the conclusion reached by this jury. For these reasons, Franco and Horgan's motions for judgment as a matter of law on the excessive force and assault claims shall be denied.
Likewise, Horgan's deliberate indifference to Hogan's medical needs carries ample support. The Supreme Court in Farmer v. Brennan, ___ U.S. ___, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), defined "deliberate indifference" stating, "acting or failing to act with deliberate indifference to a substantial risk of harm to a prisoner is the equivalent of recklessly disregarding the risk." Id. at ___, 114 S.Ct. at 1978. The Court went on, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and *1319 he must also draw the inference." Id. at ___, 114 S.Ct. at 1979. Horgan inflicted the injuries. Having inflicted the blows, he knew the extent of the injuries, although perhaps not the severity. He therefore knew of the risk to Hogan. He disregarded that risk in ignoring Hogan's pleas for medical attention, and in fact, in not obtaining medical attention even without the requests.
Finally, the verdict against Horgan on the supplemental state law claim of negligence was supported by the evidence. The jury obviously concluded that he drove the van in a careless and reckless manner while transporting plaintiff to the station. This was at a time when he knew that the plaintiff was handcuffed behind his back without the benefit of restraints, handrails, or padding.

2. Chief Rotundo and the City of Utica.

Defendants move this court for judgment as a matter of law, on the issue of supervisory or municipal liability. They claim the evidence produced at trial was insufficient to support the finding of a municipal policy, practice or custom on the part of the City of Utica of failing to properly train, supervise and discipline its police officers or personal involvement of Chief Rotundo.

a. Municipal liability.

We will first address the claim of municipal liability. A municipality may not be held liable for the acts of its officers based solely on the doctrine of respondeat superior in § 1983 claims. Monell v. Dep't of Social Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); Walker v. City of New York, 974 F.2d 293, 296 (2d Cir.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993). However, § 1983 will allow suit against governmental bodies based upon an official policy responsible for a deprivation of constitutional rights. "[I]t is when execution of a government policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Monell, 436 U.S. at 694, 98 S.Ct. at 2037-38.
Plaintiff provided the jury with several logical paths by which to find municipal liability through a policy, practice or custom of failing to train, supervise or discipline its officers that caused the violation of plaintiff's rights. First, the internal investigation of plaintiff's complaint to the Utica Police evidenced an egregious lack of supervision. A lack of supervision and training was involved in the beating plaintiff received from Horgan, the application of the handcuffs by Franco, and in the denial of needed medical treatment. Finally, a policy of transporting prisoners in the rear of the police van devoid of safety equipment while handcuffed behind the back directly subjected plaintiff to excessive force.
Plaintiff presented no direct evidence at trial of a violative municipal policy or custom within the police department. However, even where "no direct evidence has been presented of a written policy existing in the ... police department, such evidence is not required. `A municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials.'" Mendoza v. City of Rome, 872 F.Supp. 1110, 1117 (N.D.N.Y.1994) (quoting Poulsen v. City of North Tonawanda, 811 F.Supp. 884, 896 (W.D.N.Y.1993)). "[L]ocal governments ... may be sued for constitutional deprivations visited pursuant to governmental `custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." Monell, 436 U.S. at 690-691, 98 S.Ct. at 2036; see also Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir.1993) ("The inference that such a policy existed may arise from `circumstantial proof, such as evidence that the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.' Ricciuti v. New York City Transit Auth., 941 F.2d [119, 123 (2d Cir.1991)].")
Focusing first on the inadequate investigation, the City's performance evidences a purposeful tolerance of civil rights violations by its employees. This tolerance amounted to deliberate indifference with regard to the supervision and discipline of its police officers. Clear, uncontroverted evidence of an *1320 assault upon plaintiff was presented to the City and Utica Police Department. The investigation into plaintiff's complaint to the Utica Police boldly ignored that evidence, arrogantly refused to search for answers, accepted without question denials by involved police officers, and concluded that the claims were not only unresolved, but unsubstantiated.
"[A] municipal policy that merely permits or tolerates unconstitutional acts by city employees [can serve as] the basis for municipal liability under § 1983." Fiacco v. City of Rensselaer, 783 F.2d 319, 326 (2d Cir.1986), cert. denied, 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987); Sarus v. Rotundo, 831 F.2d 397, 401 (2d Cir.1987). Such tolerance in the form of failure to investigate, discipline or correct violations suggests an adoption of a policy supporting such violations. "[M]unicipal inaction such as the persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of Monell." Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir.1983) (citing Turpin v. Mailet, 619 F.2d 196, 201-202 (2d Cir.), cert. denied, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980)); Sarus, 831 F.2d at 401. "The inference that a policy existed may ... be drawn from circumstantial proof, such as ... evidence that the municipality had notice of but repeatedly failed to make any meaningful investigation into charges that police officers had used excessive force in violation of the complainants' civil rights." Ricciuti, 941 F.2d at 123.
In the case at bar, Deputy Chief Taurisano found direct physical evidence of the fact that the plaintiff was beaten by a police baton in the form of baton marks on his chest. This was so serious that he was moved to photograph the injuries. So far, so good. Thereafter, the evidence supports a finding that the investigation was less than vigorous. Trial testimony indicated that the informal investigation procedures consisted of a supervising officer asking the officer who was the subject of the complaint to submit a statement on special report Utica Police Department Form 61. In this statement, Horgan never mentioned or responded to charges that he drove recklessly or assaulted the plaintiff. No interrogation of Horgan took place, and only this statement was used for the investigative report. Chief Rotundo, when asked why the investigator never asked Horgan about the specifics of the incident for which he was accused, responded: "I don't know that he wasn't asked, and I'm not to assume anything in this business, and we don't coach the officers on how to prepare their reports. We just tell them, `Make us a report, and put everything in it that's supposed to be in it.'" (Rotundo Trial Test. Tr. at 71 (emphasis added) (hereinafter "Rotundo Tr.").)
Furthermore, plaintiff was never interviewed by the investigating officer, who apparently decided that such an interview was unnecessary after encountering problems contacting plaintiff. There is no evidence that any other officers or individuals were questioned. Detainees held in the holding cell at the time of the beating were never interviewed. No medical records were ever obtained or reviewed for the investigation. The jury could well have concluded that baton mark bruises and evidence that the injury was inflicted during police custody should have led to a deeper investigation, including questioning of other officers on duty and any other possible witnesses. At the conclusion of the investigation, no one was charged, no one was disciplined, all officers were cleared, and more important, the question of how a prisoner was injured while in the custody of the Utica police remains unanswered. The investigation concluded that the charges were unsubstantiated despite photographs of baton bruises.
Regardless of whether the investigation would find defendants Horgan and Franco personally responsible for the assault upon Hogan, its undertaking was necessary to convey a policy strongly discouraging such acts. Yet policymaking personnel accomplished exactly the opposite, conveying a strong statement of support for civil rights violations by their tolerance of these violations. Their refusal to root out the culprits responsible for the so evident harm issues a shout of support for such actions without a word spoken. *1321 Their silent support and protection showed a lack of supervision and a deliberate indifference to the truth.
Chief Rotundo testified that unsubstantiated charges are never indexed or put in an accused officer's file.[3] Utica Police Department policy, concerned with an officer's personnel file appearing smeared by an excess of unsubstantiated complaints, protects its officers from such an appearance by not filing these complaints in a manner traceable to the particular officer. Rather they are filed alphabetically by complainant.
Problems caused by the investigation procedures described above are compounded by lack of training in dealing with detainees. Horgan was never able to identify any formal training in police law enforcement matters in which he participated. Chief Rotundo testified that besides his high school equivalency diploma, he personally had never received any formal education or training in police law enforcement matters, nor in the twenty-four years as Chief did he ever pursue any kind of education or training in police administration.
To better focus upon the municipal policy, practice or custom of lack of training found by the jury, the Court turns to Walker, 974 F.2d at 297-298, where the Second Circuit set out a three tiered test to determine municipal liability where a policy of inadequate supervision and training existed.
Plaintiff is required first to prove that a policymaker, Chief Rotundo in this instance, "knows `to a moral certainty' that [his] employees will confront a given situation." See id. at 297 (citing Canton v. Harris, 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989)). Plaintiff has shown sufficient evidence to the jury for them to reasonably decide that Chief Rotundo knows police officers will often confront situations in which they are tempted to strike detainees or retaliate against verbal abuse with unnecessary physical force. Chief Rotundo also testified that official policy was for detainees to remain handcuffed behind the back during transport in the rear of the police van, despite it being devoid of any padding or restraints to prevent injury. Additionally, plaintiff presented sufficient evidence in the testimony from Chief Rotundo and from witnesses placed in the police holding cell, that Chief Rotundo knows officers will often be in the position of determining whether to obtain medical attention for injured detainees.
"Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult, or that there is a history of employees mishandling the situation." Id. (emphasis added). A choice may be considered "difficult where, although the proper course is clear, the employee has powerful incentives to make the wrong choice." Id. The handling of detainees will often present difficult questions for officers, especially when detainees become verbally abusive. Officers can be tempted to physically abuse or ignore the complaints of detainees, especially where the detainees have been antagonistic. In Fiacco, both assault and denial of medical attention were claimed against the arresting officers, and plaintiff made successful claims of municipal liability based on insufficient training and negligent supervision of the officers in this respect. Fiacco, 783 F.2d at 323-327. Proper transportation of prisoners can also present difficult questions to officers, especially in the situations such as described in the instant case, where wild driving could lead to serious injury. The testimony of Chief Rotundo, showing that it was policy to transport individuals in the police van while handcuffed behind the back, supported a finding of deliberate indifference to whether detainees would be injured by being thrown about.[4] *1322 Chief Rotundo also testified that although he did not make the decision to purchase a van with no restraints or padding, it was a delegation of his authority. Additionally, Chief Rotundo and Horgan testified that there was no formal training in driving and using the police van. Horgan testified about receiving "on the job" training for proper operation of the police van. He testified that the same rules of the road applied to the van as to ordinary drivers. He testified that since the police van was larger than his own vehicle, he drove it in a more cautious and careful manner. In this testimony, plaintiff provided the jury with sufficient evidence to show that Chief Rotundo was deliberately indifferent to whether detainees would be hurt by transportation in the police van.
Walker's alternate basis for liability that there be "a history of employees mishandling the situation," 974 F.2d at 297, can also be shown by testimony of an emergency room doctor, Dr. Parker. He corroborates a history of officers physically abusing prisoners or mishandling situations in the following portion of the transcript:
Q. Okay. And in your experience, have people been brought to the Faxton Hospital from the Utica Police Station? you know, people who have been arrested and presented with injuries, physical injuries; and have they in the past, given complaints of being assaulted by the Utica Police?
. . . . .
A. Yes.
Q. How frequent an occurrence is that, in your personal experience?
A. That's a difficult question. I probably see one or two a month that will come in saying they've been assaulted by the police.
(Dr. Parker Tr. at 16.) Plaintiff has met the second part of the Walker test.
"Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." Walker, 974 F.2d at 298 (citing Canton, 489 U.S. at 390, 109 S.Ct. at 1205). Causing physical harm to citizens by use of excessive force, through improperly transporting, beating, or denying them proper medical attention is a violation of the Fourth, Eighth and Fourteenth Amendment right to be free from excessive force, and cruel and unusual punishment. This is sufficient to fulfill the final part of the Walker test.
Police officers must be trained to ignore verbal abuse and to avoid physical retaliation. The evidence offered, of the superficial investigation and Chief Rotundo's attitude toward this proceeding, supports a finding that such retaliatory physical abuse is considered by the City, the police department and its supervisors to be reasonable treatment of unsavory detainees. Proper training would curtail such activity and such views. Considering this, the treatment of plaintiff by Franco and Horgan supports the jury finding that the City of Utica, in training its police officers, was deliberately indifferent to the constitutional rights of its citizens.
Municipal liability may lie as well for the failure of any officer to provide plaintiff medical attention for the entire night of July 4-5, 1992.[5] Horgan initially refused plaintiff's request for medical aid. Later, other persons in the holding cell requested medical treatment for plaintiff, with no response from officers. That no one on duty would investigate such pleas for medical attention, forcing plaintiff to wait until the shift changed the next day before receiving proper treatment, constitutes a blatant disregard for plaintiff's constitutional rights and well being. The investigation into plaintiff's complaint did not address this problem. Insufficient training and supervision were responsible for the denial of medical aid.
Finally, Chief Rotundo's appearance on the witness stand strongly bolstered support for a finding of deliberate indifference. Chief Rotundo was vague and evasive in answering *1323 questions.[6] He steadfastly defended his officers in opposition to clear and convincing evidence that the plaintiff had received an unnecessary beating while in police custody. For example, he answered that circumstances would dictate the permissibility of an officer beating with a baton a detainee whose hands where cuffed behind his or her back, and refused to answer whether it would be permissible, in any situation, for a large, physically dominant guard to strike a small detainee with a baton, again with the detainee's hands cuffed behind the back.[7] His testimony in itself was sufficient to convince a reasonable jury that he was deliberately indifferent to violations of the rights of detainees by officers under his supervision.
Therefore, plaintiff provided sufficient evidence to pass the Walker test and to support the jury's finding that the City of Utica provided inadequate training, supervision, and discipline of their police officers to the extent of being deliberately indifferent to the constitutional rights of detainees. Also, it substantiated the jury's decision that this inadequate training and supervision was a proximate cause of plaintiff's sufferings and damages from excessive use of force and denial of medical attention. For these reasons, this court deems that the jury was reasonable in finding municipal liability. See Batista, 702 F.2d at 397. The City of Utica's motions for judgment as a matter of law shall be denied.[8]
There are important distinctions between the present case and Sarus, where the Second Circuit Court of Appeals did not find the City of Utica liable for a policy, practice or custom of deliberate indifference. Sarus, 831 F.2d at 401-402. In that case, testimony by Chief Rotundo  accused of inadequate training and supervision as in the instant case  showed training in excess of state minimums, refresher courses, previous disciplinary actions and a system of handling complaints which did not give him sole discretion. Id. Contrary to the situation in Sarus, there is no longer a Public Safety Commissioner to handle citizen complaints or introduce new police policy. See id. at 399. As alluded to in his testimony, Chief Rotundo alone is now responsible for the supervision of the police, and the informal investigation described above is the result. In Sarus, the court *1324 required some evidence of other constitutional violations, and not simply the events surrounding the plaintiff. Id. at 402. Here, Dr. Parker testified that he regularly heard complaints of police brutality in the local emergency room where he worked. Sterling testified that he believed the Utica police would extract revenge for his testimony, insinuating that it would not be unusual, and stating his plans for leaving the area to avoid being beaten. The evidence introduced was sufficient to show a problematic number and regularity of complaints, with a reputation familiar enough to cause a witness to flee the area. The Second Circuit in Sarus explained that there was no duty to have an indexed system of complaints  which would allow identification of the number of complaints against a given officer  immediately before criticizing the plaintiff for not reviewing the files of the defendant officers. Id. at 402. Such indexing would, however, aid the City in supervising and reviewing specific officers and give the relevant information on prior complaints. Though there is no duty to so index complaints, it has been recommended by the New York State Commission on Criminal Justice and the Use of Force. This court allows that lack of such indexing may be a factor of inadequate supervision if supported by other evidence.
Also distinguishing this case from Sarus, plaintiff highlighted several Utica Police Department practices that evidenced deliberate indifference to the violation of detainees' constitutional rights. In Sarus, the use of excessive force occurred during an arrest at a bar. Id. at 398. The officers claimed that the plaintiffs resisted arrest. Id. In this case, excessive force was used against a helpless victim whose hands were cuffed behind his back, and occurred at the arrest, in transport, and at the station. Defendants do not claim that plaintiff was injured while resisting arrest. The policy of transporting detainees with their hands cuffed behind the back, in a van devoid of padding or restraints, directly subjected plaintiff to excessive force. Plaintiff was also denied medical assistance overnight. Testimony pointed to the absence of adequate training in these respects, with Chief Rotundo placing great emphasis on the need for officer discretion, which this court believes is insufficient justification for inadequate training. Each offense against plaintiff lends support to the finding of municipal liability.
The evidence supports the jury's finding that the City of Utica in this case was deliberately indifferent to the constitutional rights of detainees to be free of abuse.

b. Supervisory liability.

Defendants also moved this court for a judgment as a matter of law on the issue of supervisory liability. Chief Rotundo was held personally liable for his actions as Chief of Police in failing to supervise, discipline, or train those officers in his charge.
It is undisputed that plaintiff must establish the personal involvement of the defendant prior to the assessment of damages in a § 1983 case. McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977), cert. denied, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). Suing a defendant merely in his supervisory capacity cannot result in liability. However, in certain situations, a supervisory official can be said to have been personally involved in a constitutional violation, and thus be subjected to § 1983 scrutiny. In the case of Williams v. Smith, 781 F.2d 319 (2d Cir.1986), the Second Circuit laid out four separate scenarios under which a supervisor would be deemed personally involved. A supervisor is personally involved when he or she: (1) directly participated in the violation; (2) failed to remedy the wrong after learning of the violation through a report or appeal; (3) created a custom or policy fostering such violations, or allowed such a custom or policy to continue; or (4) was grossly negligent in managing subordinates who caused the violation. Id. at 323-24.
As is clear from the discussion above of municipal liability, Chief Rotundo's actions fall into the last three of these categories. While no evidence was presented of his direct participation in the violation of Hogan's rights, he allowed the violations to stand after having learned of them, and either created or allowed to stand a policy fostering such violations.
*1325 First, it is clear that Chief Rotundo was presented with clear evidence of a violation of Hogan's rights when informed of the injuries he received. His allowance of a superficial investigation demonstrated a failure to remedy an obvious wrong. At best, he was grossly negligent in this instance. At worst, he deliberately allowed the policy of indifference to exist and continue. Chief Rotundo's uncritical acceptance of the investigation's conclusions with all of its deficiencies showed his concern not with righting a wrong, but rather with protecting the aggressor.
Therefore, the evidence clearly supports the jury's determination that Rotundo created a policy of fostering violations or allowed such policy to exist. As reviewed in the discussion of municipal liability, the investigation, the training of police staff, the indexing and filing of complaints, the open and obvious tolerance of violative conduct, the countenancing and advancing of nonaccountability by officers all point to his establishment or support of a policy fostering constitutional violations.

B. Rule 59(b)  New Trial.

On a motion for a new trial, "the trial judge is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner." Bevevino v. Saydjari, 574 F.2d 676, 684 (2d Cir.1978). However, the mere fact that the trial judge may not agree with the jury's verdict is no reason alone to grant a new trial. Mallis v. Bankers Trust Co., 717 F.2d 683, 691 (2d Cir.1983). Grant of a new trial is warranted only where the court "`is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" Sorlucco v. New York City Police Dep't, 971 F.2d 864, 875 (2d Cir.1992) (quoting Smith v. Lightning Bolt Productions, Inc., 861 F.2d 363, 370 (2d Cir.1988)); Slade, 810 F.Supp. at 399.
Upon an independent review of the conflicting versions of the events, the jury's verdict on the liability issues was supported by a fair interpretation of the evidence. Therefore, a new trial on liability shall be denied.
However, the defendants further contend that they are entitled to a new trial or a remittitur on compensatory damages because the award by the jury was excessive. As noted above, plaintiff has been awarded $200,000 for permanent physical injuries, denial of medical treatment, and pain and suffering.
The award in this case reflects the jury's acceptance of plaintiff's evidence that he suffered several forms of damage. The application of handcuffs in too severe a manner caused immediate swelling and extended nerve damage, a permanent loss of sensation in one hand, and required treatment through immobilization of his wrist, and pain medication. He suffered a possible permanent back injury, diagnosed as a chronic lumbar strain, which caused severe pain and loss of sleep. It required treatment by regular wearing of a molded back brace, physical therapy, pain medication and anti-inflammatory medication through injections and oral medication. He experienced pain and suffering from repeated police baton blows resulting in abdominal pain, vomiting and nausea, severe bruising to the upper and middle chest, extensive bruising around his left elbow and on the inner aspect of his upper left arm, along with bruising on his right shoulder. He received abrasions on his right knee, lacerations on his lower leg and the injury to his back from being tossed about the interior of the police van, and he was denied medical assistance potentially exacerbating any and all of these injuries. Beyond the physical manifestations, mental distress and emotional suffering contributed to plaintiff's injuries in the form of fear of the police and the uncalled for pain and inhumane treatment inflicted by them; fear of being arrested and put in a similar situation, unable to defend himself and left injured curled up in a ball on the floor of a cell crying without needed medical aid; an inability to sleep; nightmares; flashbacks; and cold sweats, all caused by the events in July 1992.
The well settled standard for setting aside or reducing a jury award via remittitur is "whether the award is so high as to shock the judicial conscience and constitute a denial of justice." Ismail v. Cohen, 899 F.2d 183, 186 *1326 (2d Cir.1990); O'Neill v. Krzeminski, 839 F.2d 9, 13 (2d Cir.1988); Zarcone v. Perry, 572 F.2d 52, 56 (2d Cir.1978).
A judgment must be set aside or reduced "where the damages awarded are so excessive as to shock the judicial conscience." Raucci v. Town of Rotterdam, 902 F.2d 1050, 1058 (2d Cir.1990) (citations omitted). "To determine whether an award of damages is shockingly excessive when the law of a particular state is applied, we must examine and compare the challenged award with awards made in similar cases in the courts of that state." Id. A court should look at that state's awards because "[j]ury verdicts and judicial opinions approving or disapproving them, when considered over a period of time, provide `some indication of the consensus of opinion of jurors and courts as to the proper relation between the character of the injury and the amount of compensation to be awarded.'" Martell v. Boardwalk Enterprises, Inc., 748 F.2d 740, 750 (2d Cir.1984) (quoting Senko v. Fonda, 53 A.D.2d 638, 639, 384 N.Y.S.2d 849, 851-52 (2d Dep't 1976)). These cases are used as "a point of reference by which to gauge the appropriateness of the award." Matthews v. CTI Container Int'l, Inc., 871 F.2d 270, 278 (2d Cir.1989); Raucci, 902 F.2d at 1058; Fuentes v. Consolidated Rail Corp., 789 F.Supp. 638, 645 (S.D.N.Y.), aff'd, 978 F.2d 706 (2d Cir.1992). Numerous cases have been reviewed, and the following illustrates some comparable awards since no one case can ever be completely on "all fours" when dealing with damages.
Breaking the award into its component parts for comparison, it falls well within the range of reasonableness of comparable cases. First considering mental distress and emotional suffering: Speller v. New York City Transit Auth., No. 204366/86, 1988 WL 367151, (N.Y.Civ.Ct., Trial Date Feb. 1988) (LRP JURY), involved a suit for false arrest and imprisonment, and excessive force. Id., at *1. Plaintiff was arrested for trespassing and disorderly conduct after she apparently refused to leave an area when police politely asked her to do so. Id. She was arrested, beaten with a baton and imprisoned. Id. She suffered emotional distress and depression along with post-concussion syndrome with residual traumatic headaches. Id. She received $1,250,000 in compensatory damages. Id.
The plaintiff in Peponakis v. City of New York, No. 15015/87, 1992 WL 677670 (N.Y.Sup.Ct., Trial Date Sept. 1992) (LRP JURY), received a jury award of $50,529 for emotional distress for being falsely arrested and held in an unsanitary jail for one night without food or water. Id., at *1. He was not beaten or denied medical treatment, harassed, or assaulted in the manner Hogan suffered. Id.
In Zarcone, where a judge, after drinking very bad coffee, had the plaintiff coffee vendor handcuffed and brought before him to be berated and threatened with the loss of his livelihood, the plaintiff received a compensatory award of $80,000, and $60,000 in punitive damages. Zarcone, 572 F.2d at 53. The award was affirmed on appeal. Id. at 57. Here, plaintiff's distress went beyond simple embarrassment, to fear of mortal injury.
The plaintiff in the case of Boone v. State of New York, No. 74203, 1992 WL 408677 (N.Y.Ct.Cl., Trial Date Mar. 1992) (LRP JURY), was awarded $45,000 for damages of emotional distress when he was falsely accused and arrested for a crime he did not commit, and falsely imprisoned by the defendant. Id., at *1.
In the case of Bromner v. City of New York, 1987 WL 231350 (N.Y.Sup.Ct., Trial Date Apr. 1987) (LRP JURY), the plaintiff, a New York cab driver, suffered psychological injuries, along with hematomas, an injury to his esophagus, and lacerations on his wrists when he was arrested, assaulted, and beaten by the defendant police officer, and held in custody for forty-eight hours. He had called for the police after grabbing a woman passenger by the wrist who was attempting to flee without paying his fare. Id., at *1. The police arrested him instead. Id. The jury awarded him $100,000 in compensatory damages. Id. Hogan, like this plaintiff, was beaten and held in prison overnight. Hogan likewise suffered emotional harm and permanent wrist and back injuries, as well as injuries as a result of baton blows.
*1327 In a case from the Southern District of New York, an altercation with police resulted in injuries similar to those suffered by Hogan. Posr v. City of New York, No. 87-CV-6575, 1989 WL 395968 (S.D.N.Y. Dec. 21, 1989); see also Posr v. Doherty, 751 F.Supp. 1082 (S.D.N.Y.1990) (order vacating jury award in part), rev'd and remanded, 944 F.2d 91 (2d.Cir.1991). The plaintiff, claiming assault, false arrest and imprisonment, intentional infliction of emotional distress, and malicious prosecution, as well as relief under § 1983, stemming from an arrest for participating in a protest march for the homeless, was awarded $50,000 in compensatory and punitive damages. Doherty, 751 F.Supp. at 1084. A shoving match allegedly ensued between the protestors and police. Posr was grabbed, struck with a night stick, handcuffed and arrested. Id. Hogan experienced similar treatment, having been thrown against a fence, battered about the interior of the police van, and physically beaten with batons.
A motion under Fed.R.Civ.P. 50(b) was granted in part, setting aside $20,000 of the verdict as inconsistent. Id. at 1085-86. On appeal of that decision, the Second Circuit reversed, ordering a new trial on the false arrest and malicious prosecution claims only, due to error in the jury charge. Doherty, 944 F.2d at 99-100.[9] Thus the remaining $30,000 verdict stood for the excessive force claim. Id. The parties settled for $75,000 rather than retry the two remaining issues. See Posr v. City of New York, 835 F.Supp. 120, 122 (S.D.N.Y.1993), aff'd, 22 F.3d 1091 (2d Cir.1994).
Next considering the beating plaintiff suffered and the denial of medical assistance, Rodick v. City of Schenectady, 1 F.3d 1341 (2d Cir.1993), holds some similarities to the facts of this case. In Rodick, police responded to a call, found plaintiff in bed, and dragged him naked down the stairs and out of the building, beat him repeatedly, handcuffed him, and threw him in jail without medical treatment for the night. Id. at 1343. He received an award of $150,000 for the claim of being denied medical attention[10] and another $150,000 for use of excessive force. Id. at 1344.[11]
The plaintiff in the case of Musto v. Goggins, No. 84-CV-6126, 1989 WL 388583 (S.D.N.Y. Trial Date Jan. 1989) (LRP JURY), received an award of $305,000 when he was beaten by defendant correctional officers while held in their jail and then denied medical attention for multiple minor injuries. Id., at *1.
The Supreme Court of Onondaga County presided over a case where the jury awarded compensation for similar wrist injuries as those suffered by Hogan. See Hayes, J., Decision, Bersani v. Town of Cicero, No. 91-3965 (N.Y.Sup.Ct. Onondaga County, Oct. 1, 1992) (motion for new trial granted), modified, 199 A.D.2d 1003, 605 N.Y.S.2d 589 (4th Dep't 1993). There, plaintiff was awarded $400,000 in pain and suffering for his claims that he was arrested, handcuffed to the point of injuring nerves in his wrist, and assaulted by Cicero police officers. Hayes, J., Decision, supra. This award was reduced by the Trial Court, but then increased back to $227,777 by the Appellate Division. Bersani, 199 A.D.2d at 1003, 605 N.Y.S.2d at 589-90.
In Perry v. City of New York, No. 4603/80 (Sup.Ct.New York County, October 16, 1984), rev'd, 115 A.D.2d 376, 496 N.Y.S.2d 341 (1st Dep't 1985), the plaintiff was struck with a baton and required sutures. See New York Jury Verdict Reports, Vol. IV, Issue I, Case IV/1-13 (N.Y.Sup.Ct. Oct. 16, 1984). He was arrested and charged with disorderly conduct and resisting arrest, as was Hogan. Id. Plaintiff received an award of $250,000 in *1328 compensatory damages for the battery claim alone, and another $100,000 for false arrest. Id. The Appellate Division reversed and granted a new trial solely on the issue of damages unless the plaintiff stipulated to a reduction of the $100,000 false arrest award to $10,000 for a total award of $260,000. Perry, 115 A.D.2d at 376, 496 N.Y.S.2d at 341.
For violation of constitutional rights, pain and suffering, and emotional harm: in Ismail, where the plaintiff was found to be a victim of discrimination, assault, battery, false arrest and malicious prosecution, resulting in "chronic intermittent pain in his arms, torso and head," and "considerable mental and emotional injury that had not healed," which "interfered with his daily activities," the Second Circuit reinstated the original jury verdict of $650,000 in compensatory damages, and $150,000 in punitive damages. 899 F.2d at 186, 189.
Looking again at Bersani, in reviewing the award in terms of the damage to plaintiff's wrist, Bersani's claims included complaints of nerve damage to the radial sensory nerve in his hand as a result of the tightly clasped handcuffs. See Hayes, J., Decision, supra. This combined with the assault, afforded him $227,777 in pain and suffering after the Appellate Division modified the award. Bersani, 199 A.D.2d at 1003, 605 N.Y.S.2d at 589-90. Dr. Leroy Cooley testified for Hogan that he had experienced damage to his superficial branch of the radial sensory nerve where it traversed his right wrist.
Going outside the realm of § 1983 awards to consider the permanent damage to plaintiff's wrist: in Attridge v. Cencorp Div. of Dover Technologies Int'l, Inc., 836 F.2d 113 (2d Cir.1987), $500,000 was not excessive compensation for pain and suffering and permanently impaired use of three fingers. Id. at 118.
In the case of Kenny v. Town of New Hartford, No. 32-90-960, 1990 WL 466035 (N.Y.Sup.Ct., Trial Date Oct. 1990) (LRP JURY), a New Hartford woman who was throwing a graduation party for her daughter suffered a sprained wrist, along with bruises on her arm, and emotional distress when she was arrested by a Town of New Hartford police officer. Id., at *1. She recovered $150,000 in compensatory damages ($100,000 for false arrest and $50,000 for battery) when it was determined that the police, who were responding to a call about loud music, grabbed her arm and twisted it behind her back, and arrested her for resisting arrest and disorderly conduct. Id., at *1-2. The jury found that the music was not loud, the party was breaking up, and the plaintiff had done nothing to countenance their actions. Id., at *1.
Reviewing the total award to plaintiff, the jury in the case of Byrd v. New York City Transit Auth., No. 27725/85, (N.Y.Sup.Ct., Trial Date Jan. 1989) (LEXIS, Verdict Library, Allver File), rev'd in part 172 A.D.2d 579, 568 N.Y.S.2d 628 (2d Dep't 1991), awarded $2,700,000 for injuries suffered in an arrest by defendants. Byrd, 1994 Lexis 0057018. A male student was robbed on a train and located a Transit Authority officer. Id. The officer pushed him against the train in a prone spread eagle position and began to hit the plaintiff several times with his baton. Id. Upon plaintiff's attempts to avoid the blows, the officer arrested and handcuffed him. Id. He was brought to the station house and beaten again. Id. His hands remained restrained for several hours behind his back. Id. He was eventually brought to a psychiatric emergency room for treatment. Id. He suffered chest nonfracture, facial abrasions and scarring, and posttraumatic stress disorder. Id. On appeal of $1,450,000 of the verdict, the Appellate Division, Second Department, granted a new trial unless the plaintiff accepted a remittitur to $380,000 of that portion of the award. Byrd, 172 A.D.2d at 579-80, 568 N.Y.S.2d at 629.[12]
In the case of Kouratalis v. New York City Transit Auth., No. 16645-87, 1990 WL 463863 (N.Y.Sup.Ct. Trial Date July 1990) (LRP JURY), plaintiff was awarded $306,000, *1329 including $300,000 for pain and suffering when she was forcibly arrested and detained overnight for allegedly using the transit system without a token, although she had a special pass. Id., at *1. Defendant officer grabbed her, causing a broken fingernail, and threw her against a wall in making the arrest. Id.
The plaintiff in the case of Narvaez v. City of New York, No. 18184-83, 1988 WL 373269 (N.Y.Sup.Ct., Trial Date Nov. 1988) (LRP JURY), was awarded $30,000 in compensatory damages for suffering an arrest by defendants on two occasions in one night. First he was arrested when he was in the area of a riot that broke out and was beaten in the process. Id. Upon release, he went to the police station to determine the names of the officers responsible for his ill treatment, and he was arrested again. Id.
This court recently rendered an opinion lowering a similar verdict against Utica's sister city, Rome. In the case of Mendoza, the jury, as in this case, returned a verdict of $200,000 in compensatory damages. 872 F.Supp. at 1113. The jury found liability against the City and one of its police officers for claims of false arrest, use of excessive force, pattern, policy or practice of failing to supervise and train its officers, and for pendant state claims. Id. at 1112-13. Post trial motions were brought pursuant to Fed. R.Civ.P. 50(b) and 59(b). Id. at 1113. In granting remittitur and lowering the award to $62,500, this court saw substantial inadequacies in the evidence presented; inadequacies not present in this case. There, no physician or medical expert testimony was presented by the plaintiff. See id. at 1120. This court heard no evidence of permanency of injuries. See id. at 1120. Virtually no medical evidence at all was presented.[13]See id. at 1120-21. Such was not the case herein. Two separate medical experts involved in plaintiff's treatment took the stand. Photographic evidence documented injuries. Testimony, medical and nonmedical alike, supported the permanency of Hogan's injuries. Allowing this verdict to stand would in no way render a result incompatible with the Mendoza decision.
Upon a review of the evidence and the awards in other cases, the award of $200,000 in the present case by the jury was neither a seriously erroneous result, nor was it a miscarriage of justice. Therefore, defendants' motion to set aside the verdict as excessive and for a remittitur or new trial on the issue of compensatory damages shall be denied.

III. CONCLUSION.

The defendants are unable to show that the jury lacked sufficient evidence to support the verdict. "Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." Dimick v. Schiedt, 293 U.S. 474, 486, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935). Because this court can find no evidence of any impropriety in the jury's findings and subsequent verdict, all of defendants' motions to alter the jury's verdict must be denied.
Accordingly, it is
ORDERED, that:
1. Defendants' motion for judgment as a matter of law is DENIED;
2. Defendants' motion for a new trial on the issue of liability is DENIED; and
3. Defendants' motion for a new trial or remittitur on the issue of compensatory damages is DENIED.
The plaintiff may make an application for attorney fees and expenses. Said application shall be filed and served on or before October 2, 1995. Answering documents shall be filed and served on or before October 16, 1995.
NOTES
[1] Griffith was later granted judgment dismissing the complaint as a matter of law based on the doctrine of qualified immunity.
[2] [W]ith respect to plaintiff's supplemental assault and battery claim, the court notes that the test for whether a plaintiff can maintain such a cause of action against law enforcement officials is whether the force used was "reasonable," the exact same test as the one used to analyze a Fourth Amendment excessive force claim. Thus, if the [jury] were to find that the [individual d]efendants employed excessive force in their dealings with plaintiff, such a finding would support both a Fourth Amendment claim and a state law assault ... claim. Likewise, if the [jury] were to find that the [individual d]efendants used reasonable force, such a finding necessarily would result in the dismissal of both plaintiff's Fourth Amendment and state law assault ... claim. Cf. Lippert v. State, 207 Misc. 632, 139 N.Y.S.2d 751 (N.Y.Ct.Cl.1955).

Johnson v. Harron, No. 91-CV-1460, 1995 WL 319943, at *34 n. 3 (N.D.N.Y. May 23, 1995); reh'g granted in part, 1995 WL 411175, at *1 (N.D.N.Y. July 6, 1995) (rehearing granted solely to clarify that the United States remained a party to state claims which were subsumed into constitutional claims; rehearing was denied in all other aspects.)
[3] Chief Rotundo testified as follows:

Q. So hypothetically, an officer could have several complaints made against him by a civilian, and if they were not substantiated by your investigation or somebody else, then it would not be indexed against that police officer?
A. No, ...
(Rotundo Tr. at 76-77.)
[4] Rotundo testified as follows:

Q. Okay. Well, Officers Franco and Horgan acknowledged that it was departmental policy to transport people handcuffed behind their back in Unit 13, the police van. Do you disagree with that?
A. Again, overall for the safety of the officer and everybody else, it probably is the best way to do it. But, again, there is exception to every case.
(Rotundo Tr. at 45.)
[5] Note that the claim of denial of medical treatment against Horgan is not at issue in this motion.
[6] Chief Rotundo presented testimony that could only be described as incredible. As an example he testified "We found that harnesses, seat belts or padding were impracticable in the transporting of prisoners." (Rotundo Tr. at 47.) This colloquy followed:

Q. You said, "We decided it was impracticable."
A. Well, let's put it to you this way here: That may be a slip of a word; however, they [the Captain and Deputy Chiefs] could have told me what they were doing.... But the decision that was made was theirs.
Q. Well, Chief, you're the highest ranking uniformed officer in the police department. You're not passing the buck; are you? All decisions that are made are under your command, and you're responsible for them; are you not?
A. Anybody who knows my reputation in this community knows that I don't pass the buck to anybody, counselor.
Q. Okay. Okay. So the decision as to whether or not they equipped this van with padding or seat belts or other restraints is a decision that you're assuming responsibility for; are you not?
A. No, I am not. I left that decision entirely up to the Deputy Chiefs and uniformed Captains, because they are the ones that are the most familiar with the operation of the van and many other aspects of the department that I don't have the time to personally become involved in each and every individual matter.
Id. at 49-50.
[7] Rotundo testified:

Q. Well, Chief, if a person under arrest and in custody were handcuffed behind their back, would it be permissible for one of your officers to strike that person with a nightstick?
A. That would all depend on what the circumstances were.
. . . . .
Q. John Hogan has testified that he's 5 foot 4. PLAINTIFF HOGAN: Yes.
Q. 145 pounds. John Hogan was in custody. He had his hands cuffed behind his back. He has testified in this courtroom that Officer Horgan came into the police van and beat him repeatedly with a nightstick some 15 to 20 times. Would that, in your opinion, be permissible use of force?
. . . . .
A. I cannot answer that yes or no, your Honor.
Id. at 19-21.
[8] The City of Utica likewise remains liable for the acts of Horgan and Franco via state law claims under the doctrine of respondeat superior.
[9] The only issue to be determined at the new trial would be whether Posr reasonably believed he was free to leave. This was because the excessive force verdict remained standing, and thus, the Second Circuit noted that the jury must have found the officer's level of intrusion to be unreasonable under the circumstances. Id.
[10] While the trial court reduced this portion of the award via remittitur to $50,000, the Second Circuit vacated the remittitur and reinstated the original award. Id. at 1345.
[11] An award of $770,000 for malicious prosecution was remanded to the trial court for a new trial on that claim, leaving an award of $300,000 standing, with one claim still unresolved. Id. at 1349.
[12] The Appellate Division lowered the awards of compensatory damages of $950,000 to $250,000, punitive damages against defendant Marc Collo from $200,000 to $75,000, punitive damages against defendant Walter Arnesen from $175,000 to $15,000, and punitive damages against defendant Linda Suber from $125,000 to $35,000. Id.
[13] The plaintiff accepted the remittitur of $137,500 and an amended judgment of $62,500 was entered.